

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-05-392-CV

IN THE INTEREST OF M.R.J.M., A CHILD

------------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY

------------

## OPINION ON REHEARING

------------

### I. Introduction

The trial court terminated the parental rights of Appellant Michael M. to his child M.R.J.M. The trial court denied Michael's motion for new trial after a hearing under family code section 263.405 and signed an order finding that any appeals from the termination would be frivolous. *See* Tex. Fam. Code Ann. § 263.405(d) (Vernon 2008). Michael appealed from that finding and from the trial court's judgment terminating his parental rights. In an earlier order, we held that the trial court abused its discretion when it found Michael's

appeal frivolous, and we ultimately ordered a complete record of the proceedings below. After reviewing the record and all briefs filed, we affirm the judgment terminating his parental rights.

## II. Factual and Procedural Background

M.R.J.M. was born in September 1999; she was six years old at the October 2005 trial. M.R.J.M.'s mother ("Mother") was sixteen when she met and moved in with Michael, then age thirty-three. Mother left Michael while M.R.J.M. was still a baby, but Michael always knew where to find them.

Mother abused drugs: marijuana and cocaine when she was with Michael; mostly methamphetamine and marijuana by the time M.R.J.M. and Mother's other children were removed by Child Protective Services ("CPS") in 2004.[1] The father of Mother's other three children executed a voluntary affidavit of relinquishment of his parental rights before trial. Mother executed a voluntary affidavit of relinquishment of her parental rights to all four children before closing arguments.

---

[1] Mother pleaded guilty to two felony counts of injury to a child after hospital authorities discovered that her eight-month-old twins had skull fractures, black eyes, and other serious injuries. Her other two children, including M.R.J.M., suffered from serious cases of head lice. Mother blamed her then-boyfriend for abusing her children and testified that she never saw anything.

The jury charge indicated that to terminate Michael's parental rights to M.R.J.M., the jury had to find by clear and convincing evidence that "at least one of the following" had occurred: that Michael knowingly placed or knowingly allowed M.R.J.M. to remain in conditions or surroundings that endangered her physical or emotional well-being; that he engaged in conduct or knowingly placed M.R.J.M. with persons who engaged in conduct that endangered her physical or emotional well-being; or that he constructively abandoned M.R.J.M. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N) (Vernon 2008). The jury charge also required that, to terminate Michael's parental rights, the jury had to find by clear and convincing evidence that termination of the parent-child relationship would be in M.R.J.M.'s best interest, and the jury charge listed factors that the jury could consider. *See id.* § 161.001(2).

The application question stated, "Should the parent-child relationship between [Michael] and the child, [M.R.J.M.] be terminated?" The jury responded, "Yes." The trial court ordered termination of Michael's parental rights in accordance with the jury's verdict.

3

Michael filed a motion for new trial, setting out his statement of points for appeal.[2] The trial court denied Michael's motion for new trial, found him indigent, and found his appeal frivolous. Michael appealed.

In our initial review of Michael's appeal, we ordered a record "of all of the evidence admitted [at trial]." *See In re M.R.J.M.* (*M.R.J.M. I*), 193 S.W.3d 670, 674 (Tex. App.—Fort Worth 2006, order) (en banc). On March 28, 2008, we issued an opinion affirming the trial court's frivolousness finding, and Michael filed a motion for rehearing. Subsequently, we withdrew the March 28 opinion. We issued an order on September 9, 2008, granting Michael's motion for rehearing and ordering Michael to file a brief on the merits regarding those issues not already addressed in his statement of points because we agreed that Michael's issue challenging the constitutionality of section 263.405(i) was not frivolous.[3] In our order, we concluded that Michael's appeal presented a

---

[2] Michael's statement of points contains the following: that the evidence was factually insufficient to support the jury's findings on the grounds for termination under section 161.001(1)(D), (E), (N), and (2); that the trial court misinformed the venire and commented on the weight of the evidence during voir dire; that the trial court erroneously submitted the charge in broad form; that section 263.405(i) violates the Separation of Powers Doctrine; and that, to the extent section 263.405 requires a showing that an appeal would not be frivolous before the appeal may proceed, it violates the Due Process Clause of the United States Constitution.

[3] Michael argued on rehearing that his appeal could not be frivolous because, during the pendency of his appeal, this court decided that section 263.405(i) was void as violating separation of powers. *See In re D.W.*, 249

4

substantial question for appellate review, and we sustained Michael's first rehearing issue, holding that the trial court abused its discretion by finding Michael's appeal frivolous and restricting the appellate record to the section 263.405(d) hearing. We ordered that Michael was entitled to appeal from the trial court's termination order and that he was entitled to a complete record of the underlying proceedings.

### III. Discussion

**A. Michael's Complaints**

Michael's original brief contains the following four issues:

[Issue 1]: Does section 263.405(g) of the Texas Family Code unconstitutionally interfere with this Court's jurisdiction under section 6(a) of article V of the Texas Constitution?

[Issue 2]: To the extent section 263.405 requires a showing that an appeal would not be frivolous before the appeal may proceed, does it violate the Due Process Clause of the United States Constitution?

[Issue 3]: The trial court erred in finding the appeal frivolous [complaining that section 263.405(i) violated the separation of powers doctrine, the broad-form jury charge submission was

---

S.W.3d 625, 640 (Tex. App.—Fort Worth) (holding that section 263.405(i) is unconstitutional because it unduly interferes with the appellate court's substantive power to rehear and determine issues on the merits that were decided in the court below), *pet. denied*, 260 S.W.3d 462 (Tex. 2008). And he argued that his appeal could not be frivolous because this court granted an en banc hearing in *M.R.J.M. I*. The State conceded on rehearing that these points were not frivolous.

improper, the trial court made an improper comment during voir dire, and the evidence was not factually sufficient to support grounds (D), (E), and (N) and the best interest finding].

[Issue 4]: The trial court erred in instructing the court reporter not to prepare a record of the trial and by ordering the court reporter and the clerk to prepare records of the section 263.405(d) hearing only.

Michael's brief in support of his motion for rehearing contains the following five issues:

[Rehearing Issue 1]: The trial court erred in finding the appeal frivolous and, in turn, restricting the appellate record to the section 263.405(d) hearing, held on November 22, 2005.

[Rehearing Issue 2]: The evidence is factually insufficient to show [Michael] knowingly placed or knowingly allowed [M.R.J.M.] to remain in conditions or surroundings that endangered her emotional or physical well-being.

[Rehearing Issue 3]: The evidence is factually insufficient to show [Michael] engaged in conduct or knowingly placed M.R.J.M. with persons who engaged in conduct that endangered her physical or emotional well-being.

[Rehearing Issue 4]: The evidence is factually insufficient to show [Michael] constructively abandoned the child who had been in the permanent or temporary managing conservatorship of the Department or an authorized agency for not less than six months and (a) the Department or authorized agency had made reasonable efforts to return the child to the father, (b) the father had not regularly visited or maintained significant contact with the child, and (c) the father had demonstrated an inability to provide the child with a safe environment.

[Rehearing Issue 5]: The trial court erroneously submitted the charge in broad form.

6

Michael stated that after reviewing the October 1, 2008 supplemental reporter's record, he had no further issues that he wanted to raise.

## B. Mooted Issues

The mootness doctrine prevents courts from rendering advisory opinions, which are outside the jurisdiction conferred by article II, section 1 of the Texas Constitution. *See Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000). An issue may become moot when a party seeks a ruling on some matter that, when rendered, would not have any practical legal effect on a then-existing controversy. *See In re H&R Block Fin. Advisors, Inc.*, 262 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding); *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex. App.—Dallas 2007, no pet.).

Michael's arguments under Issue 1 were effectively mooted by our holding in *M.R.J.M. I*.[4] 193 S.W.3d at 674–76. And his arguments under

---

[4] Michael argued that our review was curtailed because section 263.405(g) limited the contents of the appellate record to the frivolousness hearing record only, and he argued that our opportunity to review was limited by a lack of briefing on the merits. However, we determined in *M.R.J.M. I* that an appellate court has the authority to order the preparation of a record of all the evidence in a termination case when necessary to review a trial court's determination that an appeal raising a factual sufficiency complaint is frivolous. 193 S.W.3d at 674–76. And section 263.405(g) provides that the court, in considering an appeal of the trial court's frivolousness finding, may require the parties to file appellate briefs on the issues presented, as we did here. *See* Tex.

7

Issue 4 and part of Rehearing Issue 1 were also mooted by our order in *M.R.J.M. I*, as well as by our September 9 order.[5] *See id.* at 676. Issue 2 and part of Issue 3 were also mooted: Issue 2 by our September 9 order, and Issue 3 by our holding in *D.W.*[6] 249 S.W.3d at 640. We now address the following

_____

Fam. Code Ann. § 263.405(g); *M.R.J.M. I*, 193 S.W.3d at 674–76.

[5] Our September 9 order acknowledged that Michael's issue challenging the constitutionality of section 263.405(i) was not frivolous and effectively mooted Michael's complaint about section 13.003(b) of the civil practice and remedies code being used as the trial court's standard for determining whether his appeal was frivolous. *See* Tex. Fam. Code Ann. § 263.405(d)(3); Tex. Civ. Prac. & Rem. Code Ann. § 13.003(b) (Vernon 2002).

[6] In Issue 2, Michael argued that section 263.405's required showing that an appeal is not frivolous violates procedural due process because it emphasizes the speed of judicial proceedings over accuracy and the best interest of the child by unfairly requiring appellate counsel to identify appellate issues and argue the merits of those issues without the benefit of a record. *See* Tex. Fam. Code Ann. § 263.405(f) (appellate record not due until sixty days after order); *id*. § 263.405(b) (statement of points due within fifteen days after order); *id*. § 263.405(i) (appellate court cannot consider any issues not presented in the statement of points). In Issue 3, he complained that section 263.405(i), the statement of points requirement, violated the Separation of Powers Doctrine. However, while a parent's right to retain custody of his children is a constitutionally protected liberty interest that must be afforded procedural due process, *see In re G.C.*, 66 S.W.3d 517, 524–25 (Tex. App.—Fort Worth 2002, no pet.), Michael was not harmed here by the statutory deadlines because we have since held that the trial court abused its discretion by finding his appeal frivolous, ordered the entire trial record to be produced for him, and held that an appellant is not limited to raising on appeal only those issues contained in the statement of points. *See D.W.*, 249 S.W.3d at 640; *see also M.R.J.M. I*, 193 S.W.3d at 674–76 (holding that appellate court can order the preparation of a reporter's record of the termination trial).

8

overlapping issues: the remainder of Issue 3 and Rehearing Issues 2, 3, 4, and 5.

**C. Trial Court's Comment**

In Issue 3, Michael complains that "the trial court told the venirepersons that the case involved injured children that the parent had allegedly abused." Because his daughter, M.R.J.M., had not been injured and there were no allegations that Michael had harmed her or any other child, he asserts that this comment was prejudicial and improper.

To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a). If a party fails to do this, error is not preserved, and the complaint is forfeited. *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). The following conversation occurred during voir dire:

> [State's attorney]: . . . But we've got four children, ranges two to six, and we need every one of you that gets chosen to listen to the evidence and decide does this parent's rights need to be terminated. And it's not really about the parent, it's about the children. It's always about the children.
>
> [The Court]: I think that we've only had a little discussion about verbal abuse. And I think it's important for the panel to know that

9

the facts that you will hear about this week are much more serious than verbal abuse.

[State's Attorney]: Your Honor—

[The Court]: And those of you that are taking into account the difficulty, realize it's not verbal.

Mother's attorney then requested to approach the bench and a conversation was held off the record. Because Michael failed to object, he did not preserve this issue.[7] *See* Tex. R. App. P. 33.1(a); *Bushell*, 803 S.W.2d at 712. We overrule this portion of Issue 3.

## D. Factual Sufficiency

In Issue 3 and Rehearing Issues 2, 3, and 4, Michael complains that the evidence is factually insufficient to support the jury's findings on endangerment

---

[7] Furthermore, a trial court has great discretion in the manner it conducts a trial, and it possesses "the authority to express itself in exercising this broad discretion." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001). And the complaining party first must show that the comments were improper and then show that the improper comments prejudiced him. *Metzger v. Sebek*, 892 S.W.2d 20, 39 (Tex. App.—Houston [1st Dist.] 1994, writ denied), *cert. denied*, 516 U.S. 868 (1995). Michael is unable to do that on the record before us. The trial court's comment was not inaccurate as this case involved termination of parental rights to four children—M.R.J.M. and her three younger half-siblings. Two of those half-siblings had been injured, and Mother had pleaded guilty to charges of felony injury to a child; at this point in the trial, she had not yet signed an affidavit of relinquishment of her parental rights. Our review of the record reveals no testimony by any witness that Michael had physically abused M.R.J.M., and the jury was instructed to consider only the exhibits and evidence introduced under oath.

10

and constructive abandonment and its best interest finding. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (2).

### 1. Standard of Review

A parent's rights to his children are constitutional interests. *See In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). But while parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.* In a termination case, the State seeks not just to limit parental rights but to erase them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App. — Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination

11

is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), or (N) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the

12

truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 2. Endangerment

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to

the acceptability of living conditions, but also to a parent's conduct in the home).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634.

To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 267 n.39, *and C.H.*, 89 S.W.3d at 26. Drug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being. *See In re W.A.B.*, 979 S.W.2d 804, 806–07 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (upholding termination where mother used illegal drugs during and after pregnancy), *disapproved of on other grounds, J.F.C.*, 96 S.W.3d at 267 n.39; *Dupree v. Tex. Dep't of Protective &*

14

*Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (using illegal drugs and violating parole provided sufficient evidence of endangerment). While imprisonment alone is not a basis to terminate a parent's rights, it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being. *See S.M.L.*, 171 S.W.3d at 478–79. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *M.C.T.*, 250 S.W.3d at 169; *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there was legally and factually sufficient evidence of both endangerment grounds when, among other things, the evidence showed that parent exposed children to domestic violence and refused to participate in CPS service plan).

15

With regard to subsections (D) and (E), Michael complains that while there was evidence that he knew Mother used marijuana and other drugs at one time, there was also evidence that he was unaware that she was still using marijuana, that he had no knowledge that Mother had resumed using the other drugs, and that he was not aware that Mother was physically or emotionally abusing any of the children.

Michael also acknowledged, however, that Mother was a drug addict when he met her, and he testified that he used drugs after M.R.J.M. was born. Mother testified that she smoked marijuana while pregnant with M.R.J.M. and that Michael was present when she did. Mother testified that she had never done anything after breaking up with Michael to give him the impression that she was no longer using drugs. Michael testified that after Mother had more children, "I believe that if she was using drugs, the doctors would have tested her and the kids [would] have been removed. They were not."

Mother testified that Michael hit her only once, but that she was holding M.R.J.M. at the time. Michael admitted that he hit Mother, but he claimed that it was in self-defense and that Mother was not holding M.R.J.M. at the time.

Mother testified that she always initiated visits between M.R.J.M. and Michael, even though Michael knew where to find them, and that she took M.R.J.M. to visit him three or four times after they separated but that Michael

16

never sought M.R.J.M. out and he never brought formula or diapers. Michael agreed that he always knew where Mother lived. He claimed that he called M.R.J.M., spoke with her "almost all the time," and initiated phone contact 99% of the time and that he walked tremendous distances to visit M.R.J.M., bring her food, and make sure that she was safe. But he also testified that he never went to Mother's house to check on M.R.J.M.

Mother testified that Michael once told her that he would rather let his family starve than to get out and do anything.[8] Mother testified that Michael's sister called CPS in 1999 because she was concerned about M.R.J.M. not being fed. Michael's sister testified that she saw Mother and Michael feed M.R.J.M. water instead of milk or formula when M.R.J.M. was an infant, that the baby did not have any food, and that their house was dirty during that visit.

Mother testified that Michael's priorities are "all about him and his injuries." Michael receives government disability payments for his back injuries. Mother testified as follows with regard to Michael's behavior when M.R.J.M. was born:

---

[8] Michael's sister testified that although Michael has back problems, he is still capable of working. Michael testified, "Social Security does not tell me I have to work. . . . Medicare would much rather my health be placed as a priority than be placed in a position for where I have to work."

17

Q. What did [Michael] tell you he felt about the day you were in the hospital?

A. Well, prior to [M.R.J.M.] being born there was always hospital visits. And the day she was born he'd actually made a statement that he couldn't believe I was being admitted into the hospital when he wasn't over his back injuries. And [M.R.J.M.] was laying on the bed and the nurse was in there, and he actually grabbed his chest. He kind of went over, but he didn't fall on her, and we moved her. Then he stayed in the hospital bed the entire time, until he went home later that night.

Q. In your hospital bed?

A. Yes, ma'am.

Q. Where were you?

A. On the chair with the baby and my family.

Michael's contributions to M.R.J.M.'s financial welfare, other than $200 that he sent to her over a period of four years from her birth, began with a deduction from his government disability payments when she was around four years old. Mother testified that she had to pawn her stereo the day that M.R.J.M. was born in order to pay the electric bill, and that when she was with Michael, they frequently went without electricity or food. Both Michael and Mother testified about his pack-a-day cigarette habit, and Michael testified that he lost forty pounds in a year because he did not have sufficient money to buy food.

18

Mother testified that she did not think that Michael could take care of M.R.J.M., stating,

> He was old enough then to take care of us, to take care of her, and he didn't. And I don't think that can change now. I don't think she'd be safe there; mentally, emotionally. I don't think he is responsible enough to take care of her. . . . I don't know if the heat's going to be on. I don't know if the electricity is going to be on every time.

Additionally, at the time of trial, Michael was on felony probation for a 2001 forgery conviction, and he testified that he had known for over a year that there was a warrant out for him because he had not reported in on that probation since 2002—almost three years before trial.[9] He testified that if he had had M.R.J.M. with him and had been arrested, he did not believe that this would have risked her safety and security.

Based on the foregoing and giving due deference to the jury's findings, the jury could have formed a firm belief or conviction that Michael knowingly allowed M.R.J.M. to remain in an endangering environment with Mother by ignoring Mother's drug use and failing to check on M.R.J.M. and that he engaged in endangering conduct by neglecting M.R.J.M. and his probation responsibilities and by knowingly placing M.R.J.M. with Mother, a person who

---

[9] Outside the jury's presence, the trial court confirmed the open warrant, and Michael was arrested.

19

engaged in endangering conduct.[10] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *H.R.M.*, 209 S.W.3d at 108. Therefore, we overrule this portion of Issue 3 and Rehearing Issues 2 and 3.

### 3. Constructive Abandonment

A parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship of the State or an authorized agency for not less than six months, (2) the State or the authorized agency has made reasonable efforts to return the child to the parent, (3) the parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability to provide the child with a safe environment. Tex. Fam. Code Ann. § 161.001(1)(N); *In re A.S.*, 261 S.W.3d 76, 88–89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Michael contests the second, third, and fourth elements of the constructive abandonment ground.

The State's preparation and administration of a service plan for the parent constitutes evidence that the State made reasonable efforts to return the child to the parent. *See, e.g., In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.); *In re S.S.*, No. 11-05-00083-CV, 2006 WL 1285125,

---

[10] For example, Mother testified that M.R.J.M. had seen her smoke crack more than once.

20

at *2–3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.). Michael's attorney stipulated that five service plans were prepared for Michael. Furthermore, although Michael lived in Mabank, Texas, the State made special arrangements for Michael to have parenting classes nearby, in Athens, Texas.[11] And a CPS worker came out to Michael's home and drove him to his psychological assessment. Nonetheless, Michael failed to complete his service plan: he failed to attend his drug, alcohol, and MHMR assessments, and he neglected to complete the parenting classes.

Michael had only two visits with M.R.J.M. over a seventeen-and-a-half month period, complaining that he lacked money and transportation to visit more frequently. His second visit occurred eight days before trial. With regard to his transportation problems, Michael testified that it cost him $112 to visit M.R.J.M. and that he could not afford that on the amount of money he receives for his disability. However, he also testified that he pays $67 per month for cable and approximately $14 per week ($56 per month) to support his cigarette habit. And the jury heard the following testimony from Michael at trial:

---

[11] The trial court took judicial notice of the fact that mileage between Athens and Mabank is 18.5 miles. It took judicial notice of the fact that mileage between Forney, where Michael was supposed to attend his MHMR assessment, and Mabank is 36.3 miles, and not the 110 miles that Michael complained of.

21

Q. The question was, [M.R.J.M.] has a right to expect that someone who wants to parent her comes and visits with her and makes a bond with her every month, at least. You haven't done that, have you?

. . . .

A. No.

Q. So you haven't had consistent contact with her?

A. No.

Q. You haven't maintained a significant contact with her, have you?

A. No.

Q. And you haven't visited regularly?

A. No.

Michael did write to M.R.J.M., but one of his three letters that was entered into evidence was deemed inappropriate by CPS and not delivered.[12]

_____

[12] In a letter dated November 3, 2004, Michael's CPS worker stated,

I cannot give [M.R.J.M.] this letter because it would not make much sense to [her]. The letter talks about things that you are questioning the state about and not focusing on [M.R.J.M.]. [M.R.J.M.] needs a letter that encourages her and talks about how you are doing. You have in the past written very appropriate letters and I am asking you to reflect on this and rewrite a letter to [M.R.J.M.].

Michael testified that he and his brother lived together and that someone from CPS had visited his trailer four or five months before trial, before he started to restore the twenty-year-old trailer. He testified, "I risked my life to restore my home," referring to his physical disabilities, and he testified that he invested all of his money in his trailer.

Although Michael testified that he spent $3,000 to restore the interior of his trailer and to fix a room for M.R.J.M., he admitted that all of the electrical sockets and plugs were not completely installed and that those might constitute a hazard, he admitted that he was not finished with the restoration yet—including M.R.J.M.'s bedroom and bathroom, and he stated that to finish the restoration would take an additional two weeks.

Based on the foregoing and giving due deference to the jury's findings, the jury could have formed a firm belief or conviction that Michael constructively abandoned M.R.J.M. by failing to regularly visit or maintain significant contact with her, by demonstrating an inability to provide her with a safe environment, and by failing to complete his service plan despite the State's reasonable efforts to return M.R.J.M. to him. *See* Tex. Fam. Code Ann. § 161.001(1)(N); *H.R.M.*, 209 S.W.3d at 108. Therefore, we overrule this portion of Issue 3 and Rehearing Issue 4.

### 4. Best Interest of the Child

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist

24

these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

M.R.J.M. receives counseling twice a month from a licensed counselor, Heather Brogan McCarty, who specializes in abused or neglected children, and she had been attending counseling for over a year by trial.[13] One of Michael's two visits with M.R.J.M. occurred with McCarty there. McCarty testified that Michael told her his goal for that visit was to see if M.R.J.M. wanted to live with him and that he had brought M.R.J.M. some presents. She testified that

---

[13] McCarty testified that when M.R.J.M. first came to see her, M.R.J.M. was having problems with sleepwalking and nightmares.

she informed Michael that "it was not okay for him to give [M.R.J.M.] the presents prior to asking her where she wanted to live so that it didn't seem like a bribe." However, Michael still gave M.R.J.M. the presents prior to talking with her about where she wanted to live.[14] McCarty also testified that Michael made a lot of promises to M.R.J.M. that she thought were unlikely to occur.[15] She testified that at the end of the session, M.R.J.M. told Michael that she wanted to stay where she was.

McCarty also testified that M.R.J.M.'s foster parents had no unrealistic expectations about M.R.J.M. and her siblings, that they had good parenting skills, and that she had no concerns at all about M.R.J.M. or her siblings being in the foster home. McCarty testified that her concerns about Michael were that he would not be able to meet M.R.J.M.'s needs or follow through with the promises that he had made to M.R.J.M., including her visits with her siblings.[16]

---

[14] McCarty testified that one of the presents, a portable CD player and two CD cases, one of which did not contain a CD, was not an age-appropriate gift for M.R.J.M.

[15] McCarty testified that Michael promised M.R.J.M. that if she came to live with him, she would maintain contact with her siblings and that he would enroll her not only in dance classes like her foster parents had, but that he "would enroll her . . . in every dance class she wanted to take if she came to live with him." McCarty testified that she found that unlikely, based on Michael's financial and transportation issues.

[16] McCarty testified, "I think that [to separate M.R.J.M. from her siblings] would be very detrimental to her emotional well-being and her feeling

Michael admitted at trial that he had not looked into whether dance classes for M.R.J.M. were available in his area.

With regard to M.R.J.M.'s siblings, Michael testified that he never thought about what it might do to M.R.J.M. to take her from the foster home and away from her brothers and sisters. He stated,

> The decision in reference to splitting the children up, I am adamant in stating that this is not a concern of mine in reference to the way I should view it. Because I know that I can allow [M.R.J.M.] to visit the other children. And that's my contention is that being [M.R.J.M.'s] dad, I—I shouldn't have to be denied my right to be a dad because there's other children involved.

Michael's sister testified that before trial, Michael called her and said, "I understand [that] you're going to be sitting—you're going to be on the side of the children." She testified that she tried to explain to him why she felt it was in M.R.J.M.'s best interest to stay with her siblings.

Furthermore, Mother, Michael's sister, and Michael himself testified about Michael's conspiracy theories. Mother testified that Michael was paranoid and saw conspiracies everywhere, and that "[w]hen you expressed to him that you didn't understand [his thoughts on conspiracy], that they w[ere] off the wall, then you must be in on it too." Michael testified that he felt that the reason the State had custody of M.R.J.M. was that he was being extorted and that it was

of safety and security."

27

"oppression through the State of Texas for custody of my daughter," and he would not go to the State for assistance because it would not provide him with assistance.[17] He also testified about a girl who lived in Mabank that was the same age as M.R.J.M., that he believed that the girl was M.R.J.M.'s twin, and that he wanted a paternity test to prove it. He gave the following testimony with regard to a July 2004 letter that he sent his CPS caseworker:

Q. Let's look down at the bottom, towards the bottom of the page, about three quarters of the way. "[Mother] is not an honest individual and although I'm the parent of a child," quote, "'[M.R.J.M.]?' I have no regrets as the letter—as a letter she wrote to me, which is included. [B]elieve her dad is Ricky, a neighbor of mine. May be wrong. If you ever have a chance to watch the movie, 'Lamboda,' Lou Diamond Phillips, the scene at the end of the movie with a plane wreck was in reference to me. Both Thomas and Ricky, I believe, to be doctors." Why is that important?

A. Because I'm going through a case pertaining to [M.R.J.M.], and this isn't a runaway jury type of case. This pertains to my daughter. This doesn't pertain to tobacco issues or the lung issues that I might have going on in my health.

Q. Okay.

A. I know that she [apparently, Mother] does associate herself with a tobacco company.

---

[17] Michael stated, "You want to judge me as an individual that's trash for which the State of Texas is supposed to protect. I'm disabled. Crimes against the disabled, I should be protected of. I wouldn't go to you, ma'am, nor that Child Protective Services over there for any assistance because I kn[e]w you wouldn't help me."

28

Q.   Let's look at the next page at the bottom, it's the last sentence, "I never married [Mother], nor am I dead. Yet the Cowboys receive 400 million for a stadium referred to . . . Enron article. I've been referred to as many people from . . . Lenny, John, Ron plus more." [W]hy was the Cowboys stadium important in the cost?

A.   Because the money in reference to that case right there, for which I have mentioned to my attorney, I believe to be my money.

Q.   "Depends on the [S]tate. This isn't Night of the Living Dead to Kelly's version or Carey in Oklahoma." [W]hat did that reference?

A.   I'm living, okay. I mean, I live a simple life. Old Johnny in Arlington isn't dead. I mean—I mean, you got to understand, people have another identity sometimes or an alias for which you may not always know.

. . . .

Q.   . . . I want to look at what kind of looks like the third paragraph, it's a little bit above the middle of the page. "Either way, although I am concerned for the children, I'm leaving the investigation to the," quote, "'fraudulent.' Believe they refer to me and the injuries I have. Remember Lisa is Bart's sister." Was that another attempt at humor?

A.   Actually, Lisa Kudrow is a real good friend of mine. I will clarify this right now. I do know a Lisa Kudrow, for which she stars on "Friends." I dated her in high school. So, yeah, I refer to her a lot.

Q.   . . . [I]n this letter when it says, "remember Lisa is Bart's sister," you're talking about Lisa Kudrow?

A.   Yes. I want to clarify this right now.

Q. "You have a chance to review an article by a Lisa Steadfelt the Third. Christopher is Bart and I have included a press clipping in reference to Barbara and Chris. This infringes on conspiracy and a possible attempt on my life. Also I have given possible leads to theft involving Doug." So you believe there were threats on your life?

A. I believe in the past I've had threats upon my life, yes. But I'm not saying at this point in time my—my—my situation right now is dangerous for [M.R.J.M.], because it's not. I've survived in my community just fine for three years.

With regard to a January 2005 letter to his CPS worker, Michael elaborated as

follows:

Q. Look on the second page at the bottom, last paragraph. "Love [M.R.J.M.], glad you had the chance to participate in this. This could be a tobacco lawsuit. Might have to talk to Gene Hackman." What did that mean? What's the tobacco lawsuit?

A. Well, I believe at this point in time I have lung problems that are being covered up medically. And I think they're being—lying about my medical condition because in Arkansas, I traveled to Arkansas. And I sought medical, and they found a blotch on my left lung. Since returning to Texas, I have not been able to obtain a doctor for which will view that film and say you have anything wrong with your lung. But Arkansas contests that there is.

Q. Who was Gene Hackman?

. . . .

A. It would appear as though he's a lawyer.

. . . .

30

Q. The next paragraph says, "At this point as America views the situation we learn about government, civil rights and especially parent rights. I suggest parents, moms especially, should have kids at home and not at a hospital. Kids for some reason tend to disappear." Where do they go?

A. One more time, I'm questioning the medical pertaining to my daughter. I mean, I guess the twins may just be factual. As stated before, there's a beautiful little girl in my community that is her precise age. Now, until I can be proven that this woman's DNA—I'm sorry, this girl's DNA is not my daughter, I will contest that she is my daughter up until proven otherwise by this court.

. . . .

The Court: So you're requesting this Court to order a little girl that lives in Golden Acres to be DNA tested?

A. Yes, ma'am.

Michael testified as follows with regard to his letter dated September 14:

Q. So I'm about three quarters of the way down. And it says, "Questioned the Child Protective Services in Weatherford. Review the medical findings of the case manager investigator for which is in question have a past history pertaining to illegal activity, where involved in my neighbor's case. This isn't a tobacco lawsuit, or is it?" Do you think our case is a tobacco lawsuit too?

A. Yeah, I think—I think I need to know who John Grisham is, to be honest. I have no idea. Has this Court—has this been in reference to any other material at all other than my daughter? Yes, I am very concerned of issues pertaining to this. And if there is any evidence for which we'll find that you pertained in any other legal proceedings involving me, then I would ask the Court to respect my civil rights.

31

Q. Let's continue. "If this is, I haven't been paid. Not smart, yet I have common sense to know when I should protect my rights. As stated before, Thomas, Rick and Phillips have a history, and Steve Martin just might be Lee Harvey Oswald. Steve, Delores and Mary— Steve, Delores and Mary have a history of involving themselves in children's lives. Abusing the system, 'Rosemary's Baby,' to Steve Martin mov[ie] . . . involving the child he found in the woods near a lake. 'Bless the Child' family on the opposite side of the street from me. The judge in 'Identity' was the judge in a recent movie Steve Martin produced. As stated before this case stems back to 2001." And we're going to skip that next part. If you would go towards the end, and I think you're asking the Judge, "if you assist me in obtaining this I won't sing the Lamboda while I'm here in court."

A. Yeah. Ricky, I guess Richard Pryor, Ricky and I, Ricky, whatever his name is, Vallens or whatever, he does live on the right side of me. So, yeah, I guess I question Dolores Phillips [his CPS worker] having known this individual, yes.

Michael's letters were admitted into evidence.

Michael also testified that he expected M.R.J.M. to respect him, to believe him, and to be reared according to his beliefs. He stated, "until you can prove me wrong, anything I've stated in this court of law today, I believe to be right."

Mother testified that, even if Michael had completed his service plan, she would still have doubts about his ability to care and provide for M.R.J.M., stating that she would "worry about her living in a car one day. Going without food or groceries."

32

The evidence at trial demonstrated that Michael lacked the will and ability to provide M.R.J.M., then age six, with a safe environment: he failed to accept, complete, and cooperate with the State's service plan; he failed to effect personal and environmental changes until only a short time before trial—the last two months in a seventeen-month process; and he failed to demonstrate adequate parenting skills. Furthermore, the jury heard his bizarre testimony about his conspiracy theories, including his theory that M.R.J.M. had a twin that lived across the street from him.

The jury could have chosen to believe M.R.J.M.'s therapist's testimony that M.R.J.M. wanted to stay with her foster family and with her siblings and Mother's testimony that the foster family provided M.R.J.M. and the other children with the structure that neither she nor Michael ever provided. Because the jury could have formed a firm belief or conviction that terminating Michael's parental rights to M.R.J.M. was in M.R.J.M.'s best interest, we conclude that the evidence is factually sufficient. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28. We overrule this portion of Issue 3.

**E. Broad Form Jury Charge**

Finally, Michael asserts in Issue 3 and Rehearing Issues 1 and 5 that he challenged the trial court's broad form submission of the jury charge. However, he admitted that this challenge is contradicted by controlling Texas case law

33

that specifically authorizes broad form submission in parental rights cases. *See Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *see also J.T.G.*, 121 S.W.3d at 128–29 (applying *E.B.* to uphold jury findings on grounds for termination when multiple grounds for termination were sought and the trial court submitted the issue using a broad form question). Furthermore, having found no error with regard to his factual sufficiency challenges, it is unnecessary for us to consider whether disjunctive submission was harmful. *See, e.g., In re J.M.M.*, 80 S.W.3d 232, 245, 248–50 (Tex. App.—Fort Worth 2002, pet. denied) (reaching same conclusion on similar facts), *disapproved of on other grounds, J.F.C.*, 96 S.W.3d at 267 n.39. Therefore, this issue is moot. We overrule this last portion of Issue 3 and Rehearing Issue 5.

## IV. Conclusion

Having overruled all of Michael's issues, we affirm the trial court's judgment terminating Michael's parental rights to M.R.J.M.

BOB MCCOY
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: February 26, 2009

34