# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00471-CV

**D. H. a/k/a D. T., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
### NO. D-1-FM-11-000099, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

D.H. a/k/a D.T. appeals the trial court's final decree terminating her parental rights to her child, H.M., following a jury trial.[1]  *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2012). Appellant challenges the legal sufficiency of the evidence to support that statutory grounds exist for termination and the factual sufficiency of the evidence to support that termination of her parental rights was in the best interest of her child.  She also contends that the trial court abused its discretion by denying her request to strike the pleadings of appellee the Texas Department of Family and Protective Services based upon its alleged failure to produce emails in discovery.  Because we conclude that the evidence was sufficient and that the trial court did not abuse its discretion by

---

[1]  We use initials to refer to appellant and her child.  *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2012); Tex. R. App. P. 9.8.

denying appellant's request to strike the Department's pleadings, we affirm the trial court's final decree of termination.

## BACKGROUND

The Department filed an original petition affecting the parent-child relationship and was appointed temporary managing conservator of H.M. in January 2011.[2] H.M. was approximately two months old at the time and was living with her biological father and appellant. The Department was involved with the family during the entirety of H.M.'s life but did not seek removal until appellant took H.M. to the hospital in January. At that time, H.M. was diagnosed with multiple fractures at different stages of healing, and she had a facial bruise. The Department placed H.M. in foster care.

The Department ultimately sought termination of appellant's parental rights. The Department's plan for H.M. was for her to be adopted by a couple who adopted one of appellant's other children in 2007. The couple intervened in this proceeding and also sought to have appellant's parental rights terminated so that they could adopt H.M. Appellant had three children prior to H.M. Two of her children tested positive for drugs when they were born, and she relinquished her parental rights to those children. She also lost her parental rights to the other child in a proceeding that occurred in a different state.

---

[2] H.M.'s father did not answer or appear in the case and, by interlocutory decree, the trial court terminated his parental rights before the jury trial. The trial court incorporated its interlocutory decree into the final decree, and the father has not appealed the decree.

During the pendency of this case, appellant tested positive for drugs on multiple occasions over several months, but she had not tested positive for drugs for approximately one year before trial. She also completed court-ordered services such as parenting classes and regularly visited with H.M. Her visits were supervised and generally limited to two hours. She also had not worked for over a year, did not have health insurance, and required medication for mental health issues.[3]

After a six-month extension, the jury trial occurred in June 2012. The Department called appellant as its first witness. She testified about the period of time that H.M. lived with her and H.M.'s father and her relationship with H.M.'s father and the Department. Appellant was in the care of the Department the majority of her own childhood and was subject to numerous placements. She also was abused by relatives as a child and by H.M.'s father during their relationship, which lasted on and off for over six years. She testified that, during the period of time that H.M. was in her care, she was scared of the father, he was using drugs, and he physically abused her and restrained her from leaving. She only left their apartment a few times during this period. She testified that she witnessed the father putting H.M. in the closet when she was crying, "forcefully pulling my child's legs apart like a wishbone," and tripping after he had been drinking while holding H.M., causing H.M. to hit her head. Appellant also testified that her mother and others told her that the father was abusing H.M. and that she was concerned that H.M. had a vaginal tear around December 26, but she did not take H.M. to the doctor until January when she took H.M. to the hospital. On that day, she

---

[3] Appellant testified during the trial that she was recently added to her husband's health insurance, but her husband testified that she was "mistaken." A caseworker testified that appellant did not provide proof of insurance to the Department.

left H.M. in the father's care for several hours before she returned with the police. Appellant's relationship with the father ended at that time.

The Department also called as witnesses Child Protective Services (CPS) caseworkers, appellant's parenting coach, and the court appointed special advocate (CASA) volunteer assigned to this case. Based upon their observations of appellant's actions and her progress, the Department's witnesses expressed concern about her ability to care for H.M. and to keep her safe if H.M. were returned to her care. They uniformly testified that they did not believe that appellant was capable of safely parenting H.M. unsupervised based in part upon their observations of appellant's visits with H.M. The Department's witnesses testified that appellant suffered from anxiety attacks with physical reactions when trying to take care of H.M.'s basic needs, such as changing a diaper, and failed to recognize risks created by her actions to H.M.'s physical and emotional needs.

Other witnesses who testified on behalf of the Department included the pediatrician who examined H.M. at the hospital in January 2011, a clinical psychologist who performed tests on appellant in February 2011 and May 2012, and a clinical social worker who provided counseling to appellant from February to May 2012. The pediatrician testified that H.M. had a bruise on her face and was recovering from four skeletal fractures that were in different stages of healing when appellant brought H.M. to the hospital in January 2011. The psychologist diagnosed appellant in May 2012 with "major depressive disorder recurrent moderate, posttraumatic stress disorder, ADHD, learning disorder NOS and personality disorder NOS."[4] He recommended that appellant continue

---

[4] The psychologist explained that "NOS" means "not otherwise specified."

with therapy. The clinical social worker opined that appellant was not able to safely parent an 18-month-old and that there would be risks even as the child aged.

Witnesses who testified on appellant's behalf were her husband and her therapist. Appellant met her husband shortly after this case commenced and, a few months later, they were married. Her husband testified about their relationship and plans if H.M. were returned to them. He described possible relatives and friends that would be available to provide support to appellant if he was out of town or otherwise not available. The husband was employed, but they were having financial difficulties. The therapist testified about the progress that appellant had made during the pendency of the case. When asked, however, whether appellant had the "skills for parenting and the skills for dealing with her mental health to be able to effectively parent [H.M.] 24/7," the therapist testified that she was unable to make that assessment because of her "limited role" with appellant.

The trial court submitted the case to the jury, and the jury found that appellant's parental rights should be terminated. In accordance with the jury's findings, the trial court entered the final decree terminating her parental rights and appointing the Department sole managing conservator. This appeal followed.

## ANALYSIS

To terminate parental rights, the Department has the burden to prove one of the predicate grounds in section 161.001(1) of the family code and that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is the clear and convincing standard. Tex. Fam. Code Ann. § 161.206(a) (West 2008); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). The clear and convincing

5

standard is "'the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code Ann. § 101.007 (West 2008) (defining clear and convincing evidence). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Appellant raises legal and factual sufficiency challenges to the evidence. Legal sufficiency review of the evidence to support a termination finding requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence to support a termination finding, a court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* (citing *In re C.H.*, 89 S.W.3d at 25); *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (describing factual sufficiency standard of review in appeals from termination orders). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

***Predicate Statutory Ground***

In her first issue, appellant challenges the legal sufficiency of the evidence to support that statutory grounds exist for termination. The Department sought termination based upon two statutory grounds. *See* Tex. Fam. Code Ann. § 161.001(1) (D), (E). Because the termination decree can stand on one statutory ground plus a best interest finding, we limit our review to the first ground—that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See id.* § 161.001(1)(D); *In re A.V.*, 113 S.W.3d at 362 (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987))*; see also In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005) (addressing legal sufficiency of evidence to support termination of parent's rights based upon section 161.001(1)(D)). "A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards." *In the Interest of M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under section 161.001(1)(D)." *Id.* (citing *Castorena v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 Tex. App. LEXIS 3753, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.)).

Appellant focuses on the Department's alleged failure to produce emails in discovery. She contends that the "trier of fact could not have made a reasonable determination because of the missing evidence" and, therefore, that her rights should not have been terminated. The following evidence, however, supports the jury's finding that appellant knowingly placed or knowingly allowed H.M. to remain in conditions or surroundings that endangered her physical or emotional well-being:

- Appellant testified that H.M. lived with her and the father prior to H.M.'s removal and that appellant only left their apartment "[o]nce or twice" during that time period.

- Appellant testified that she left H.M. in her father's care for several hours on the morning after she witnessed the father "forcefully pulling my child's legs apart like a wishbone."

- Appellant testified that the father put H.M. in a closet when H.M. was crying.

- Appellant was warned by her mother and others that the father was abusing H.M. during the time that H.M. was living with them.

- A caseworker testified that appellant reported that the father put H.M. in the closet in her stroller when she was crying and that appellant saw the father "pick [H.M.] up by her legs and being rough when changing her diaper."

- The CASA volunteer testified that appellant reported that her mother told appellant that the father held H.M. upside down by her ankles "so she would stop screaming" and that a friend told her that the father put H.M. in her car seat "pushing on her ribs" and "yanking on her arms" and that H.M.'s cry went from "a regular cry to a high-pitched scream."

- H.M. was diagnosed with multiple fractures in January 2011 that were in different stages of healing. One of the Department's witnesses testified to the significance of the injuries: "Multiple stages of healing means that injuries occurred over a period of time."

- The pediatrician who examined H.M. in January 2011 testified that the fractures were non-accidental and that her injuries would have been painful.

- Appellant's explanations for H.M.'s injuries evolved over time. Appellant told the CPS investigator on the day that she took H.M. to the hospital that the injury occurred when the father tripped while holding H.M. She later provided different explanations: (i) the father was rough with H.M., "pulling her legs and turning her over by one leg," (ii) H.M. rolled

8

over and hit her face on a toy, and (iii) the father was rough with H.M. while feeding her a bottle in the middle of the night.

• Appellant testified about the father's physical abuse, as well as drug abuse, during the course of their six-year relationship including during the time period that H.M. was in their care. For example, she testified: "At first it was just pushing and shoving and then some punches to the stomach." She also testified that she was "used to him . . . throwing things, you know, being out of control."

By appellant's own testimony, as well as the testimony of others, appellant was aware that she was allowing H.M. to remain in a setting which endangered H.M.'s physical and emotional well-being.

We also consider the undisputed evidence that does not support the jury finding. Appellant voluntarily sought help from CPS in January 2011 and took H.M. to the hospital. While this evidence supports that appellant took affirmative action to protect her child in January 2011, it does not negate the jury's finding that appellant allowed her child to remain in a setting that was dangerous to her physical or emotional well-being up until that time. *See In the Interest of M.R.J.M.*, 280 S.W.3d at 502. Appellant argues that she is being blamed for being a victim of domestic violence and that there was evidence that would support a finding that she was unaware of her child's injuries prior to taking the child to the hospital. But proof of physical injury is not the standard. *See id.* It also was within the jury's province to disbelieve appellant that she was unable to seek help for her child prior to January 2011. Appellant testified that she left the apartment on at least one occasion without the father and that the father left the apartment on other occasions. Department witnesses also testified that they spoke with her multiple times during this time frame but that she did not raise concerns about the father.

We conclude that the jury "could have formed a firm belief or conviction" that appellant "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child." *See* Tex. Fam. Code Ann. § 161.001(1)(D); *In re J.P.B.*, 180 S.W.3d at 573–74; *In re J.F.C.*, 96 S.W.3d at 266. We therefore conclude that the evidence was legally sufficient to support one of the predicate grounds for termination. We overrule appellant's first issue.

### Best Interest Finding

In her second issue, appellant challenges the factual sufficiency of the evidence to support the finding that termination of her parental rights was in the best interest of H.M. *See* Tex. Fam. Code Ann. § 161.001(2); *In re J.F.C.*, 96 S.W.3d at 266; *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). She argues that termination was not necessary because she had completed services and acquired a better support system. Appellant also focuses on the Department's alleged failure to produce emails about this case during discovery.

Factors that courts consider in assessing the best interest of a child include: (i) stability of the home or proposed placement, (ii) parental abilities, (iii) the emotional and physical needs of the child now and in the future, (iv) the emotional and physical danger to the child now and in the future, (v) the plans for the child by the individual or agency seeking custody, (vi) conduct by a parent showing that the parent-child relationship is not proper, and (vii) any excuses for the parent's conduct. *Holley*, 544 S.W.2d at 372; *see also* Tex. Fam. Code Ann. § 263.307 (West 2008) (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the

10

child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28.

Appellant presented evidence that it was not in H.M.'s best interest to terminate her parental rights. Evidence supported a finding that she had made progress through her participation in the court-ordered services and that she loved H.M., had maintained a relationship with H.M., was less anxious on her medication, and was no longer in a relationship with the father. Appellant and her husband also testified about their relationship. At the time of trial, they had been married for around a year and lived in an apartment. Her husband was stable, supported and cared for her, and was employed. There also was evidence that appellant had not had an anxiety attack for several months and that she was taking her medication for her mental health issues.

Other evidence, however, showed that appellant remained unable to safely take care of H.M. The parenting coach, the caseworkers, and the CASA volunteer testified uniformly that they were concerned that appellant was unable to take care of H.M.'s basic needs, such as changing her diapers, in a safe and appropriate manner. For example, the parenting coach who worked with appellant for approximately one year testified that appellant was "overwhelmed" and "agitated" when H.M. was "distressed" or "upset," that appellant made "minimal progress" on "goals that we had as far as risk factors and protectiveness," "that she would struggle to provide a safe and appropriate home" for H.M., and that H.M. "would continue to be at risk of future abuse or neglect" if she were returned to appellant. At the time of trial, appellant's visits with H.M. remained supervised and generally were limited to two hours.

The jury also heard specific examples of conduct by appellant from the Department witnesses that they observed during the visits between appellant and H.M. Department witnesses described appellant's anxiety attacks that they observed and their concern that H.M. was at risk of being injured during one of those attacks. One of the witnesses described appellant's anxiety attacks as "severe" and provided examples of appellant's conduct that concerned her, such as "leaving a child unattended on a table at the age that [H.M.] was," appellant's "inability to calm herself when she was having a panic attack," and "her inflexibility in interacting with [H.M.]."

The clinical social worker who provided counseling to appellant from February to May 2012 also opined that appellant was not able to safely parent an 18-month-old without constant assistance. He testified that appellant needed "[l]ong term therapy, specifically years." Appellant's witness, her therapist, testified that she would not be concerned with unsupervised visits between appellant and H.M., but she was unable to make an assessment on whether appellant was ready to "effectively parent H.M. 24/7." The jury could have credited this testimony to find that appellant was not able to safely take care of H.M. and that H.M. would be in emotional or physical danger if she were returned to appellant.

Appellant also admitted to drug use and to failing to take medication for mental health issues over extended periods of time. Although appellant testified that her only drug use during the pendency of the case was a "pot brownie" that she ate by accident, she tested positive for drugs on multiple occasions during the pendency of this case after having already lost her parental rights to two children because they were born positive for drugs. Evidence also showed that appellant and her husband may have to move in with a family friend because they cannot pay the rent on their

12

apartment, that appellant had been unemployed for several years, except for working for approximately one month at a fast food restaurant, that appellant required medication to address her mental health issues, and that she did not have health insurance. The jury could have credited this testimony to find that appellant was unable to provide H.M. with a safe and stable home.

The jury also could have credited the evidence showing the Department's plan for her child. The plan was for the intervenors who had already adopted one of appellant's other children to adopt H.M. One of the intervenors testified about their home and their relationship with H.M.'s sister. Appellant testified that, if her parental rights were terminated, she wanted the intervenors to adopt H.M. because she would be "with her sister" and "safe." She testified that she knew H.M. would be "in a loving environment where she'll be with her sister."

Appellant provided excuses for her conduct, including being abused and in multiple placements by the Department during her childhood. The jury, however, could have credited the evidence that supported findings that appellant was unable to provide for H.M.'s basic needs without supervision and that H.M. would be in physical or emotional danger if she were returned to appellant's care. *See In re H.R.M.*, 209 S.W.3d at 108 ("In reviewing termination findings for factual sufficiency, a court of appeals must give due deference to a jury's factfindings, . . . and should not supplant the jury's judgment with its own." (internal citation omitted)). The jury could have credited this evidence to form a firm belief or conviction that termination of appellant's parental rights was in the best interest of her child. *See In re J.F.C.*, 96 S.W.3d at 266. We conclude that the evidence was factually sufficient to support the best interest finding. We overrule appellant's second issue.

*Discovery Sanctions*

In her third issue, appellant contends that the trial court abused its discretion by refusing to strike the Department's pleadings for discovery abuse. Appellant sought to have the Department's pleadings struck based upon the Department's alleged failure to produce all of its emails concerning this case. Appellant contends that there was evidence from emails that were produced that a caseworker was directed to "skew the evidence" against appellant and that a "substantial portion of one caseworker's documentation was unavailable," and, therefore, that "there may have been hundreds of e-mails that would have shown a jury that evidence was created which intentionally slanted the case against the Appellant." Appellant also argues that the Department's failure to produce the emails was "particularly unfair" because the family code requires "communications" to be included within the case record. *See* Tex. Fam. Code Ann. § 264.0145 (West Supp. 2012) (defining "case record" to include "communications . . . under the custody and care of the department").

We review a trial court's ruling on a motion for discovery sanctions under an abuse of discretion standard. *See* Tex. R. Civ. P. 215; *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court may strike pleadings for discovery abuse. *See* Tex. R. Civ. P. 215.2(b)(5). However, the sanction "imposed must relate directly to the abuse found" and "must not be excessive." *Powell*, 811 S.W.2d at 917. "Sanctions which are so severe as to preclude presentation

of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *Id*. at 918.

Here, the trial court denied appellant's request to strike the Department's pleadings, and appellant did not seek a lesser sanction. At the hearing on the motion for sanctions, a CPS supervisor assigned to this case testified that all "relevant" emails had been produced. A CPS program director also testified about the Department's policy for printing out emails to include in the case file and changes in this policy beginning in September 2011. Prior to September 2011, the policy was to include "relevant and important information" in the case file. After September 2011, the "expectation" was that all emails would be put in the case file. Although the Department was unable to show definitively that it had produced all emails concerning this case, there was no evidence of "flagrant bad faith" or "callous disregard" that would support striking the Department's pleadings. *See id.* Assuming without deciding that the Department failed to produce all of its emails concerning this case in discovery, we conclude that the trial court did not abuse its discretion by denying appellant's request to strike the Department's pleadings. We overrule appellant's third issue.

## CONCLUSION

Having overruled appellant's issues, we affirm the trial court's final decree of termination.

15

_____
           Melissa Goodwin, Justice


Before Chief Justice Jones, Justices Goodwin and Field

Affirmed

Filed:   March 6, 2013