

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-19-00310-CV

IN THE INTEREST OF S.B., A.B., AND I.S., CHILDREN

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 74,476-L1, Honorable Bradley S. Underwood, Presiding by Assignment

February 21, 2020

OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Elicia appeals from a judgment terminating her parental rights to her three children, S.B., A.B., and I.S.[1]  Ricky also appeals from that judgment that terminates his parental rights to his child, I.S.  Elicia and Ricky challenge the legal and factual sufficiency of the evidence supporting the jury's predicate grounds and best interest findings to support termination of their parental rights.  We affirm.

---

[1] To protect the privacy of the children, we will refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2019); TEX. R. APP. P. 9.8(b).  The parental rights of the father of S.B. and A.B. were also terminated in this proceeding but he did not appeal.

## Background

The children, subject of this suit are fourteen-year-old, S.B., eleven-year-old, A.B., and three-and-a-half-year-old, I.S. Elicia is the mother of these children. The father of S.B. and A.B. is Eric, and Ricky is the father of I.S.

On February 13, 2018, the Texas Department of Family and Protective Services received a referral alleging physical neglect of I.S. The report primarily alleged that I.S. was coming to school dirty and that she had persistent head lice. I.S. attended a preschool program for children with disabilities. I.S. was in the program for a language delay and was nonverbal when she entered school. I.S. was often late or absent and wore dirty clothes to school two to three times a week. According to her teacher, one of I.S.'s diapers had a shard of glass in it, and a couple of other diapers had insects inside. After interviewing school personnel and I.S. at the school, the Department's investigator, Elaine Lucero, went to the home of Elicia and Ricky.

Elicia, Ricky, and Elicia's mother, Edith, have lived in the home since 2016. The home was cluttered with various articles of clothing and trash strewn throughout. There was a strong odor throughout the entire house. The living room was very messy, with cockroaches crawling on the walls. In the kitchen, the pots and pans had old food caked on them and cockroaches were crawling on the pans. There were lots of dishes piled on the counter. The kitchen was not sanitary for cooking or eating and the cockroaches presented a health risk to the children.

A.B. shared a room with her maternal grandmother, Edith. The room was "pretty messy," with a large pile of dirty clothes, food wrappers, and various articles of trash.

Edith did not have a place to store her belongings, so they were piled up against the wall and dresser. A.B.'s bed was full of toys and various items. S.B. and I.S. shared a bedroom and it was also very cluttered. The floor was not visible and there were dirty clothes and trash on the floor. Lucero noted that S.B. and A.B. had poor hygiene and body odor. The bedroom of Elicia and Ricky was similar to the rest of the home with a substantial amount of dirty clothes and trash. Another couple, Fantasia Ogle and Jonathan Flores, also lived in the home with Fantasia's two children, a three year old and a four year old. The bathroom and the back room where Fantasia and Jonathan stayed were clean.

Lucero discussed the condition of the home with Elicia and Ricky and suggested a step-by-step plan to clean one area at a time. Elicia said she was trying to keep the house in order, but she could not do it alone. Elicia blamed the children for the condition of the home.

During the six-month-long investigation, Lucero visited the family eleven times. During this time, the Department received allegations of drug use in the home involving Fantasia and Jonathan, which resulted in the removal of their two children. Elicia initially denied that the drug-use allegations were true. Later, Elicia acknowledged that she knew that Fantasia had a history of drug use when she allowed Fantasia and Jonathan to move into the home. During this same time, Elicia's niece, Stevie, was allowed to live in the home. According to Elicia, Stevie has a drug history and Elicia was concerned that Stevie was using drugs while living in the home.

3

Throughout the investigation, Lucero was concerned about S.B.'s and A.B.'s school attendance. Elicia acknowledged that the children often missed school because she had trouble getting them out of bed. Elicia was summoned to truancy court in 2016, 2017, and 2018 because S.B. and A.B. had excessive absences.

Between mid-May and the end of July, the investigator noticed some improvement in the condition of the home, although the home's foul odor and the roaches remained. However, by early August, the condition of the home had regressed to where it was at the beginning of the investigation: dirty, cluttered, odorous, and infested with cockroaches and lice.

In early August, the Department made a decision to remove the children from the care of Elicia and Ricky because of the dirty and hazardous conditions of the home. The Department contacted Eric as a potential placement. At the time, he was living in a hotel room with his girlfriend and her child. Eric voiced concerns about the living conditions with Elicia because S.B. and A.B. told him that they were embarrassed about the conditions of the home. The Department did not consider Eric as a placement after he admitted that he had pending criminal charges of child endangerment and that he smoked marijuana.

On August 9, 2018, the Department filed its petition for protection, conservatorship, and termination of Elicia's and Ricky's parental rights and sought the emergency removal of the children from the home. Amarillo police officer, Shelby Giles, was present when the Department removed the children from the home. She testified that "it's one of the worst houses I've ever seen." The living room was messy, there were cockroaches on

4

the walls, the bedrooms had trash piled in the corners, and there were bugs everywhere, including on the beds. There was bed bug spray beside the beds. The children were instructed to get some clothing, and the items they were collecting were laying on the floor. Giles testified that, "there were bugs on the clothes, the beds, they were everywhere."

The Department was granted temporary managing conservatorship of the children and assigned a caseworker. Over the next few months, the Department developed family service plans and worked with Elicia and Ricky to make changes necessary for the return of the children. Elicia and Ricky completed many of the services provided by the Department, but the conditions in the home remained dirty and cluttered, and the cockroach infestation persisted in spite of treatment by a professional exterminator. Importantly, the couple continued to allow persons with known drug histories to live in the home.

At the final hearing, the jury heard evidence that the Department's first investigation involving Elicia occurred in 2005. At that time, S.B. was eighteen months old and lived with Elicia and Eric. The investigator found unsanitary conditions in the home, which was cluttered and dirty with trash, old food, and dirty diapers. The refrigerator was not clean and there were flies everywhere. The kitchen and shower were filled with dirty dishes. The home posed a hazard for S.B., so S.B. was placed with Elicia's mother, Edith, for several hours while Elicia and Eric cleaned the home. Elicia and Eric were referred to family-based safety services and received services to address the cleanliness of the home.

In 2009, the Department validated allegations of sexual abuse of five-year-old S.B., and two-year-old A.B. At that time, Elicia was separated from Eric and she lived with her boyfriend Paul, S.B., A.B., and Elicia's mother, Edith. The perpetrator of the sexual abuse was a neighbor and former boyfriend of Elicia. He was convicted and sent to prison. During this investigation, the Department implemented a safety plan because Elicia allowed people she barely knew to move into the home with her and the children. Some of the people Elicia allowed in the home were using illegal substances. According to the Department, Elicia consistently violated the safety plan. During this time, Eric was transient, unemployed, and using marijuana.

There was also testimony of a 2015 investigation by the Department of Elicia's and Ricky's home after I.S. was born. In that investigation, Department workers found unsanitary conditions, a dirty house, and cockroaches. S.B. and A.B. were dirty, wore soiled clothing, and had lice.

Finally, the jury heard evidence about the 2018 investigation and viewed 220 Department photographs depicting the condition of the residence and the backyard as it existed from February 2018 to the week before trial in late July 2019.

The jury also heard testimony from Dr. Beth Robinson, a licensed professional counselor. Robinson testified that she first saw I.S. two days after the children were removed from the home, in August of 2018. At that time, I.S. was not meeting her four-year-old milestones. Her development was comparable to a one-year-old to an eighteen-month-old child. She was withdrawn, almost completely nonverbal, and she was not potty trained. I.S. participated in theraplay with Dr. Robinson on a weekly basis until the end

6

of March 2019.  Theraplay is an evidence-based protocol for children who have developmental delays or who have experienced neglect or abuse, to help them acquire social and emotional skills missed in the first two years of life.  Within the first two weeks of theraplay, I.S. began to acquire social and emotional skills that she did not have when she was evaluated.  By the end of March, I.S. was almost developmentally on target with her language.  Robinson explained that child neglect occurs when the physical or emotional needs of a child are not being met.  Neglect can also have an effect on the development of a young child's brain, and it impacts social development, emotional development, and physical development.  Robinson opined that I.S. was showing the impact of neglect based on her skills when she was first evaluated.  As I.S. was exposed to enrichment, she gained skills rapidly.  According to Robinson, the cause of I.S.'s developmental delays is neglect, and neglect can also adversely affect a child's hygiene, nutrition, and future mental health.

One of the services the Department offered to Elicia during the 2018 case was individual counseling with Corbie Grimes.  The goals of Elicia's counseling were to help her cope with her depression and ADHD, maintain a clean home, and not allow unsafe people to live in the home.  Overall, she made minimal progress toward the goal of house cleaning.  She did not do well applying what was discussed in the sessions to her home cleaning.  She did, however, learn some coping skills.  After twelve sessions, Grimes closed her case unsuccessfully because he did not know what else he could do to help her reach the counseling goals.

In March of 2019, the Department changed its goal from family reunification to termination because no significant progress had been made in the cleanliness of the

7

home.  Department caseworker Erin Sessions prepared a weekly cleaning schedule and visited Elicia's and Ricky's home monthly, but the cleanliness of the home changed very little.  It appeared that Elicia and Ricky were shuffling their belongings from room to room.  Elicia and Ricky could verbalize that there were problems, but they were not taking the steps to remedy the problems with the support of the Department and service providers.  Both Elicia and Ricky acknowledged that their home was not safe for the children to return to it.

Elicia's mother, Edith, has lived with Elicia and Ricky for five years.  At the time of the removal, she acknowledged that there were issues regarding the cleanliness of the home.  She did, however, indicate that the home is a lot cleaner now than it was when the children were removed.  She plans to move in with a friend if the children are returned.  While the children were in the home, Edith testified that Fantasia and Jonathan "did their drugs but we told them they had to go outside and the girls stayed away from them."  Edith knew Fantasia was smoking marijuana when she was living with Elicia, Ricky, and the children because Fantasia admitted that she was.  Edith informed Elicia of Fantasia's confession.  Fantasia stayed in the home another month after that conversation.  When asked if she ever saw Stevie, Fantasia, or Jonathan high in front of the children, Edith replied, "[w]ell, I know they were high, but I mean, they act pretty normal because they done it so long, they know how to be when they're high."

At trial, Elicia admitted that she considered the condition of her home to be an unsafe environment for her children.  Elicia acknowledged that the kitchen was filthy, and that there are objects on the floor that presented a health hazard for a five-year-old.  The city required a shed in the backyard to be removed because it was a health and fire

hazard, and Elicia admitted that the backyard would not be a suitable place for I.S. to play.

According to Elicia, Eric had limited contact with S.B. and A.B. from February to August 2018 because of his drug use.[2]  Elicia knew that Fantasia had a history of drug use when she allowed Fantasia and Jonathan to move into their home, but she claims that she did not know that Fantasia and Jonathan were using drugs while they lived in the home in 2018.  From May of 2018 to February of 2019, Elicia allowed her niece, Stevie, to live in the home.  According to Elicia, Stevie is a "dope whore" because she will not leave methamphetamine alone.  Elicia admitted that she also allowed the children to be around her sister despite knowing that her sister was a registered sex offender and abused methamphetamine.

Ricky acknowledged that the home was not an appropriate environment for I.S. because of the clutter, trash, and cockroaches, and the backyard was not a safe environment for I.S. to play.  Ricky tried several products to rid the home of lice and cockroaches but nothing seemed to work.  During the pendency of the case, Ricky continued to work at Walmart and he participated in parenting classes and counseling.  His counseling focused on parenting and maintaining home stability.  Ricky expressed frustration with Fantasia and Jonathan living in the home and acknowledged that the home environment was chaotic because of the additional people living there.  Ricky

---

[2] Eric testified that, from 2016 until the children were removed in August of 2018, S.B. and A.B. visited him every other weekend.  During that time, Eric was using methamphetamine and marijuana, although he stayed sober around S.B. and A.B.  S.B. and A.B. "have known for a very long time" that he uses marijuana, and he taught them to call it "their dad's medicine."

9

suspected that some of these people who were living in the home were using drugs. He also complained that his mother-in-law, Edith, was verbally abusive to the children.

Ricky was the parent responsible for getting I.S. ready for school each day. If the children are returned, Ricky will accept more responsibility for S.B. and A.B. and establish a detailed cleaning schedule for the children to follow.

At the time of trial, S.B. was fifteen years old and placed in a transitional living cottage at the Amarillo Children's Home. She is doing well and receiving preparation for adult-living services. She is learning how to budget and cook and has made friends. S.B. wants to go home. She wants to be able to sleep late and be with her dog. If she cannot go home, she does not want to be adopted. She wants to stay in her current placement, get her driver's license, and obtain a job. A.B. was twelve years old and is placed in a therapeutic setting and receiving counseling. A.B. also wishes to go home but, if she cannot go home, she is happy with her placement. She has enjoyed spending time in summer camp. I.S. was five years old. S.B. and I.S. are both placed at the children's home, but in different cottages. I.S. has made "huge" improvements in her development and communication skills. I.S. is doing great in her current placement. S.B., A.B., and I.S. have been in counseling throughout the case to address their emotional well-being. The Department would facilitate visits between S.B., A.B., and I.S., if I.S. were adopted.

The jury terminated Elicia's and Ricky's parental rights on the grounds of endangering conditions and endangerment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D) and (E) (West Supp. 2019).[3] The jury also found that termination was

---

[3] Further references to provisions of the Texas Family Code will be by reference to "section __" or "§ __."

10

in the best interest of S.B., A.B., and I.S. *See* § 161.001(b)(2). The Department was appointed managing conservator of S.B., A.B., and I.S.

Applicable Law

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1993)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *In re T.G.R.-M,* 404 S.W.3d 7, 12 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *In re A.V.*, 113 S.W.3d at 361).

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2019); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002). Both

elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894-95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). Even when credibility issues are reflected in the written transcript,

the appellate court must defer to the factfinder's determinations, as long as those determinations are not themselves unreasonable. *Id.*

## Standard of Review

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient, and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder

13

could not have resolved the disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Analysis

Sufficiency of the Evidence Under § 161.001(b)(1)(D) and (E)

In their first issue, Elicia and Ricky challenge the legal and factual sufficiency of the evidence to support the termination of their parental rights under section 161.001(b)(1)(D) and (E). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d at 362. Because the evidence pertaining to subsections 161.001(b)(1)(D) and (E) are interrelated, we may conduct a consolidated review. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

In this case, the jury found that Elicia and Ricky each had engaged in conduct proscribed by subsections (D) and (E). That is, the jury found that Elicia and Ricky each had (1) knowingly placed or allowed S.B., A.B., and I.S. to remain in conditions or surroundings which endangered their physical or emotional well-being, (subsection (D)), and (2) engaged in conduct or knowingly placed S.B., A.B., and I.S. with persons who engaged in conduct, which endangered their physical or emotional well-being (subsection (E)). *See* § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of endangerment. To "endanger" means to expose the child to loss or injury or to jeopardize

the child's emotional or physical health. *Boyd,* 727 S.W.2d at 533. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.,* 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *In re N.K.,* 399 S.W.3d 322, 330-31 (Tex. App.—Amarillo 2013, no pet.).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.,* 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied). Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d at 502. The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle*, 16 S.W.3d at 394.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions, but also by the parent's omission or failure to act. *In re M.J.M.L.,* 31 S.W.3d 347, 350-51 (Tex. App.—San Antonio 2000, pet. denied); *Doyle*, 16 S.W.3d at 395. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.).

The jury heard evidence that both Elicia and Ricky jeopardized the children's physical and emotional health by allowing them to live in unsanitary conditions. *In re A.T.,* 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, no pet.) (unsanitary conditions can qualify as surroundings that endanger a child). The home in which the children lived at the time of removal was deplorable. The Department investigator described the home as dirty, cluttered, and infested with cockroaches. The kitchen was not sanitary for cooking or eating and posed a health risk to the children. The caseworker testified that even Elicia and Ricky considered the home an unsafe environment for the children. The investigator noted S.B.'s and A.B.'s poor hygiene and body odor. Additionally, I.S.'s teacher testified that I.S. frequently came to school in a soaked diaper, wearing dirty clothes, and had "chronic lice." One of I.S.'s diapers had a shard of glass inside, and a couple of other

diapers had insects inside. I.S. was non-verbal, often late or absent, and wore dirty clothes two or three days a week. Dr. Robinson opined that the cause of I.S.'s developmental delays is neglect. After I.S. was exposed to enrichment, she quickly acquired social and emotional skills that she missed in her first two years of life. Neglect can be as dangerous to the children's well-being as direct physical abuse. *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam). Allowing children to live in unsanitary conditions and neglecting their physical condition can constitute endangerment. *Id.*; *In re A.P.*, 42 S.W.3d 248, 259 (Tex. App.—Waco 2001, no pet.); *In re Leal*, 25 S.W.3d 315, 325 (Tex. App.—Austin 2000, no pet.).

The jury also heard testimony that Elicia and Ricky allowed people who were using illegal drugs to live in the home, which jeopardized the children's well-being and added stress to an already chaotic and unstable home environment. Additionally, Elicia knew that Eric abused marijuana. S.B. and A.B. were also knowledgeable about Eric's drug use. Even with the awareness of Eric's drug use in the children's presence, Elicia allowed Eric to have visitation with the children. *In re M.R.J.M.,* 280 S.W.3d at 502 (unlawful conduct by persons who live in the home or with whom the children are compelled to associate on a regular basis represents part of the "conditions or surroundings" of the children's home). Elicia was also aware of drug use by Fantasia, Jonathan, and Stevie but allowed all three to live in the house with the children.

While both Elicia and Ricky admitted that the house needed to be cleaned, neither of them was able to remedy the home's condition or put forth the effort to maintain the home in a state of cleanliness for even a short period of time. The investigator and the caseworker explained to Elicia and Ricky how to clean the house and make it safe for the

17

children, but they appeared to be unable to consistently incorporate and apply what they learned. Elicia made excuses for not cleaning and blamed the home's condition and responsibility for cleaning on the children. This is especially troubling given the assistance and services provided by the Department for the previous fourteen years. The Department paid for an exterminator, gave Elicia and Ricky cleaning supplies, and furnished them with a cleaning schedule. The Department exhausted its efforts doing everything short of going into the home and physically doing the cleaning.

Having examined the entire record, we conclude that the factfinder could reasonably form a firm belief or conviction that Elicia and Ricky knowingly placed or allowed S.B., A.B., and I.S. to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or placed S.B., A.B., and I.S. with persons that endangered the children's emotional and physical well-being. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the jury's endangerment determination or was so significant that the jury could reasonably have formed a firm belief or conviction that Elicia and Ricky knowingly placed or knowingly allowed the children to remain in endangering conditions or surroundings and engaged in conduct or placed the children with persons that endangered the children's emotional and physical well-being. Accordingly, we find the evidence was legally and factually sufficient to support the subsections (D) and (E) endangerment findings with respect to the termination of Elicia's and Ricky's parental rights to the children. We overrule Elicia's and Ricky's first issue.

Best Interest of the Children

In issue two, Elicia and Ricky challenge the legal and factual sufficiency of the evidence supporting the best interest finding made under section 161.001(b)(2). A determination of best interest necessitates a focus on the children, not the parent. *See In re B.C.S.,* 479 S.W.3d at 927. Appellate courts examine the entire record to decide what is in the best interest of the children. *In re E.C.R.,* 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that it is in the children's best interest to preserve the parent-child relationship. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006).

In assessing whether termination is in the children's best interest, the courts are guided by the non-exclusive list of factors in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include: (1) the desires of the children, (2) the emotional and physical needs of the children now and in the future, (3) the emotional and physical danger to the children now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the children, (6) the plans for the children by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "[T]he State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the children.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Evidence that supports one or more statutory ground for termination may also constitute evidence

19

illustrating that termination is in the children's best interest. *See In re E.C.R.*, 402 S.W.3d at 249. The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *In re N.R.T.,* 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). We must also bear in mind that the children's need for permanence through the establishment of a stable, permanent home has been recognized as the paramount consideration in determining best interest. *See In re K.C.,* 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

*The desires of the children*

At the time of trial, S.B. was fifteen years old. S.B. is currently placed in a transitional living cottage at the Amarillo Children's Home. Although S.B. had expressed a desire to be adopted by a foster family placement, that placement was changed shortly before trial. S.B. now wants to return home so that she can sleep late and be with her dog. If she cannot go home, she wants to stay in her current placement, get her driver's license, and get a job. A.B. was twelve years old and she also wishes to go home. A.B. is happy with her placement and has enjoyed herself in summer camps. S.B. and I.S. are both placed at the children's home, but in different cottages. I.S. was five years old and is too young to express her desires. She has made dramatic improvement in her development and communication skills during the pendency of the case. I.S. is doing great in her current placement. S.B.'s and A.B.'s desire to return home does not override the evidence establishing that Elicia and Ricky placed or allowed the children to remain in unsanitary and unsafe conditions, and engaged in conduct or placed the children with persons who engaged in conduct which endangered their physical and emotional well-being. The jury could have determined that this evidence weighs in favor of termination.

*The emotional and physical needs of and danger to the children*

The next two factors are the children's emotional and physical needs now and in the future, and the emotional and physical danger to the children now and in the future. The need for permanence is a paramount consideration for the children's present and future physical and emotional needs. *Edwards v. Tex. Dep't of Protective & Regulatory Servs.,* 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997, no writ). A factfinder may infer that past conduct endangering the well-being of the children may recur in the future if the children are returned to the parent. *In re D.L.N.,* 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by, In re J.F.C.*, 96 S.W.3d at 267.

The jury heard evidence that the Department removed the children from the home of Elicia and Ricky due to neglect and because of the home's unsanitary and unsafe conditions. Moreover, the evidence showed that Elicia has an extensive history of Department involvement because of unsanitary and dangerous conditions in the home while the children were in her care. Both Elicia and Ricky acknowledged the deplorable conditions of the home when the children were removed. On more than one occasion, persons with known drug histories were allowed to move into the home and use drugs while the children were living in the home. The jury could have concluded that Elicia and Ricky are unable to meet the physical or emotional needs of the children and are unable to protect the children from physical or emotional danger. There is evidence in the record from which the jury could find that the condition of the home would continue to present a danger to the children in the future. The Department's fourteen-year history with Elicia, and more recent history with Ricky, indicate that similar conduct will occur in the future, thereby constituting evidence of emotional and physical danger to the children now and

21

in the future. *In re D.L.N.,* 958 S.W.2d at 941; *In re M.R.J.M.,* 280 S.W.3d at 502 (factfinder may infer from past conduct endangering the children's well-being that similar conduct will recur if children are returned to the parent). These two factors weigh heavily in favor of the jury's best interest determination.

*Parenting ability and programs available to assist party seeking custody*

The fourth and fifth factors will be discussed together. In reviewing the parenting ability of the parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children. *In re G.N.,* 510 S.W.3d 134, 139 (Tex. App.—El Paso 2016, no pet.). As set forth in our discussion of the second and third factors, the jury heard considerable evidence that Elicia and Ricky demonstrated an inability to meet the children's physical needs by keeping the home clean and remedying the conditions which made it unsafe for the children. The investigator and the caseworker instructed Elicia and Ricky on how and why to clean the home, but neither could consistently maintain the cleanliness of the home. The factfinder can infer from a parent's failure to take the initiative to utilize programs offered by the Department that the parent did not have the ability to be motivated to seek out available resources needed now or in the future. *In re J.M.,* No. 01-14-00826-CV, 2015 Tex. App. LEXIS 2130, at *21 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.) (*citing In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.)).

The CASA volunteer testified that Elicia and Ricky do not have the parenting skills to maintain a safe environment for the children now or in the future. She fears that, once the Department is out of the picture, the home will return to its former deplorable

conditions. The condition of the home improved very little between the date the investigation began, in February 2018, and the date of the final hearing, in July of 2019. Between 2005 and 2018, the Department conducted four investigations involving Elicia and the unsanitary and unsafe conditions in her home. Ricky was involved in the last two investigations.

In addition, the evidence reflects that Elicia and Ricky allowed Fantasia, Jonathan, and Stevie to live in the home with the children even though Elicia and Ricky were aware that guests were using drugs while living in the home. Further, Elicia allowed Eric to have weekend visitation with S.B. and A.B. even with knowledge that Eric abused marijuana. Further, the children indicated that Eric would use drugs in their presence during their visitation. A parent's exposure of children to drug use may be properly considered in determining whether a parent has demonstrated appropriate parenting abilities. *See In re M.R.J.M.*, 280 S.W.3d at 502.

The repeated failure of Elicia and Ricky to keep a sanitary and safe home for the children and their exposure of the children to drug use is sufficient evidence for a jury to determine that Elicia and Ricky do not possess the ability to appropriately parent the children. In addition the jury could have reasonably inferred that Elicia and Ricky did not have the ability to motivate themselves to seek out available resources now or in the future. The jury was entitled to find that this evidence weighed in favor of the best interest finding.

*Plans for the children and stability of the home or placement*

We will consider the sixth and seventh factors together. The sixth factor examines the plans for the children by those individuals or the agency seeking custody. The seventh factor is the stability of the home or proposed placement. Stability and permanence are paramount in the upbringing of children. *In re J.D.,* 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The factfinder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *Id.* at 119-20.

Elicia, Ricky, and Edith have lived in the same home since 2016. If the children are returned, Elicia plans to "[d]o what I've been doing." Elicia testified, "My house is going to stay clean. I'm going to get up and take them to school. Make sure their grades stay up. Make sure that they take baths and showers that—like they're supposed to regularly. Make sure they help keep the house clean, keep the rooms clean." Elicia also plans to move her mother, Edith, out of the home so that I.S. can have her own room. Ricky would accept more responsibility for S.B. and A.B. if they return home including having a detailed cleaning schedule for the children. In the future, he will not allow overnight guests to stay in the home.

The jury heard evidence that Elicia and Ricky failed to make any substantial progress in cleaning up the home during the latest intervention by the Department and that, as of May 2019, the home remained unsafe for the children. Moreover, even after the children were removed, Elicia's sister, a registered sex offender, and Elicia's niece, a known drug abuser, were allowed to live in the home. Conduct that subjects children to

24

a life of uncertainty and instability also endangers the children's physical and emotional well-being. *In re M.R.J.M.,* 280 S.W.3d at 502; *In re S.D.,* 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

The Department's plan for the children is adoption in a home with all three children together. Although S.B. has expressed the desire not to be adopted, she has not had an opportunity to discuss the benefits of adoption with her counselor. It is also possible that S.B. could be placed in the adoptive home if A.B. and I.S. are adopted. The jury could have found that the Department's plan would allow the children to achieve stability and permanence in a safe environment that takes into account the best interest of the children. This evidence supports the jury finding that termination is in the best interest of the children.

*Acts and omissions of the parent*

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. The jury heard evidence detailing Elicia's long history with the Department, and Elicia's and Ricky's inability to provide the children with a sanitary and safe environment. The children were also put at risk by being exposed to multiple individuals who used drugs while living in the home with the children. In considering this evidence, the jury could have found that the existing parent-child relationship is not a proper one.

We conclude that the evidence is both legally and factually sufficient to establish a firm conviction in the mind of the jury that termination of Elicia's and Ricky's parental rights is in the best interest of S.B., A.B., and I.S. Issue two is overruled.

Conclusion

The judgment of the trial court based on the jury verdict terminating Elicia's and Ricky's parental rights is affirmed.


                                    Judy C. Parker
                                    Justice