

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-20-00370-CV

**IN THE INTEREST OF A.C.D.**, C.N.D., M.M.D., E.N.A.-D., S.S.L., B.F.L., H.E.L., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2018-PA-02017
Honorable Monique Diaz, Judge Presiding

Opinion by:      Luz Elena D. Chapa, Justice

Sitting:      Rebeca C. Martinez, Chief Justice
      Luz Elena D. Chapa, Justice
      Liza A. Rodriguez, Justice

Delivered and Filed: January 13, 2021

AFFIRMED

B.A.[1] appeals the trial court's order terminating her parental rights, arguing legally and factually insufficient evidence supports the trial court's finding that she knowingly placed or allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being. We affirm the trial court's order.

## BACKGROUND

On September 7, 2018, the Department of Family and Protective Services filed an original petition, seeking emergency removal and conservatorship of seven children and termination of the parents' rights. Trial to the court commenced in February 2020 and was continued and later

---

[1] To protect the identity of the minor children, we refer to the parents and the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

concluded in July. The court heard testimony from three Department caseworkers and an investigator. After the evidence closed, the trial court found by clear and convincing evidence that B.A. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children and that termination of B.A.'s parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (2).[2] On appeal, B.A. contends the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(b)(1)(D), arguing the evidence does not prove she knew the children were in an endangering environment.

### STANDARD OF REVIEW AND APPLICABLE LAW

In assessing the legal and factual sufficiency of the evidence to support the trial court's findings, we employ a heightened standard of review to determine whether the trial court could have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). Under this standard, the trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses. *In re Commitment of Stoddard*, 19-0561, 2020 WL 7413723, at *5 (Tex. Dec. 18, 2020). To give proper deference to the factfinder's role, we must assume it resolved disputed evidence in favor of its findings if a reasonable factfinder could have done so. *Id.*; *J.F.C.*, 96 S.W.3d at 266.

In our legal sufficiency review, we review the evidence in the light most favorable to the finding and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. However, we must consider undisputed or uncontradicted evidence in our review, even if that evidence does not support the trial court's finding. *Id.* When

---

[2] The trial court's final order also terminated the parent-child relationship between father L.D. and the children A.C.D., C.D., M.M.D., and E.N.A.-D., and between father E.L. and the children S.S.L., B.F.L, and H.E.L. Neither of the fathers appealed the trial court's order.

conducting a factual sufficiency review, we consider the entire record. *Id.* "[R]ather than 'disregard' disputed evidence that a reasonable factfinder could not have credited in favor of the finding," we "must determine whether, in light of the entire record, that evidence 'is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the finding was true.'" *Stoddard*, 2020 WL 7413723, at *6 (quoting *J.F.C.*, 96 S.W.3d at 266).

To terminate parental rights under section 161.001(b)(1)(D) of the Texas Family Code, the Department was required to prove by clear and convincing evidence that the parent knowingly placed the children in or allowed them to remain in conditions or surroundings that endangered their physical or emotional well-being. *See In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.). "Endanger," as used in section 161.001(b)(1)(D) means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An endangering environment may be created by the physical living conditions or by the conduct of a parent or other person in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home" under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

A child may be endangered when the home environment creates a potential for emotional or physical injury; it is not necessary that injurious conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *I.N.D.*, 2020 WL 2441375, at *3. A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger, but disregards it. *M.R.J.M.*, 280 S.W.3d at 502. "A parent does not

need to know for certain that the child is in an endangering environment—awareness of a potential for danger is sufficient." *I.N.D.*, 2020 WL 2441375, at *3.

For the purpose of proving endangerment under subsection (D), the relevant period is before the Department removed the child. *R.S.-T.*, 522 S.W.3d at 108–09 (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). A termination pursuant to subsection (D) may be based upon only a single act or omission. *Id.* at 109.

### DISCUSSION

Because B.A. does not challenge the trial court's finding that termination of her rights is in the children's best interest, our review of the evidence will focus solely on the evidence relevant to the trial court's endangerment finding.

B.A.'s seven children, aged four to twelve, were removed from their parents in September 2018 after school officials contacted the Department to report that six-year-old B.F.L. had bruises all over her body. However, the Department had been previously involved with this family for many years. Crystal Jones is an investigator for the Department who worked as a caseworker with this family from 2016 until April 2019. Jones testified the Department opened a case on the family in 2012, when infant B.F.L. suffered several fractured bones. B.A. reported E.L. did not see the baby on the bed and he "plopped down on the bed." E.L. was arrested and charged with injury to a child, but the charges were later dropped. The Department's case remained open for six years, during which the children were removed several times. Jones became the family's caseworker during this earlier case. She testified the Department suspected ongoing domestic violence in the home, perpetrated by E.L., and that B.A. covered it up. Jones testified the parents were referred to services to address these issues. However, incidents of domestic violence and suspected abuse continued.

Jones testified that during the earlier case, B.A. called Jones one night and reported E.L. had "laid hands on" her. The police were called and they told E.L. to leave the house. Jones testified B.A. changed her mind about pressing charges the next day and denied E.L. had hit her. Jones testified that when the children were being reunified with B.A. and E.L., the Department received a new referral, alleging E.L. had pushed B.F.L. down the stairs. E.L. told Jones they had been in a hurry and when he patted B.F.L. on the back to move her along, she fell down the stairs. Jones testified B.A. said she had not seen the incident, and that "she just noticed there was blood on the floor but then they just took the kids to school." The children made an outcry, they were removed again, and the parents were again referred to services, including therapy.

Jones testified that during the six- year period the case was open, the children were "in numerous placements. They went from shelters to foster homes to sometimes mental hospitals." She testified it was difficult to keep them in a foster home because of serious behavioral problems that included aggression, suicidal ideations, and delusions. The children were ultimately returned to B.A. and E.L. and the case was closed in August 2018. Jones testified she had thought at the time that B.A. had learned from the services she had completed, but she later concluded B.A. had simply gone through the motions, "like a checklist."

Department investigator Maria Garcia testified that in September 2018, the school called in a report that B.F.L. had "bruising all over her body." Garcia met with B.F.L. and confirmed there were bruises of different colors that did not appear to be from the same incident. Garcia interviewed B.A., who said she had been cooking and heard B.F.L. crying, but did not think anything of it. She told Garcia E.L. was "antagonizing" the child, telling B.F.L. she had stolen a cookie from a boy at school and made him cry, so E.L. was going to make her cry. B.A. told Garcia she saw E.L. push a chair or a sofa against the child and pin her against the wall, where she was being crushed. B.A. told Garcia she then went back to cooking. B.A. denied to Garcia that E.L.

had ever been violent against the children, told her that E.L. had "choked her a few times," but that "she was unaware of what domestic violence was."

When caseworker Jones spoke with B.A. about the incident that led to the children's removal, B.A. said she had been in the kitchen and heard E.L. yelling at B.F.L. and slap her for getting in trouble at school. B.A. said she saw B.F.L. behind the couch and she appeared to be afraid of E.L. When Jones later asked E.L. about the incident, he admitted he hit B.F.L. and said "he guessed he blacked out and that's when he did all of these things." Virginia Pavon, who was the caseworker later in the case, testified B.A. told her that B.F.L. had been the instigator of the incident and that E.L. was simply disciplining her. B.F.L. was six years old at the time, and E.L. was over six feet tall and weighed between 250 and 300 pounds.

Investigator Garcia testified E.L. was arrested and charged with injury to a child as a result of the September 2018 incident, and the petition in this case was filed on the basis of the injuries to B.F.L. However, Garcia testified the other children also had bruises on them and they were taken to ChildSafe for forensic interviews, where they made "severe outcries" of physical abuse. The children all received trauma informed therapy throughout this case and had ongoing behavioral problems, some of which required hospitalization. While this case was pending, there was a finding of reason to believe as to one of the children's outcry of sexual abuse by E.L., and at the time of trial, there was an ongoing investigation of a second child's sexual abuse outcry. E.L. did not have any visits with the children after they were removed from the parents in September 2018.

When Pavon became the caseworker in May 2019, all of the children were in therapy. B.A. had again completed domestic violence and parenting classes and had started counseling. E.L. had refused to engage in services, stating he did not need them. B.A. continued to live with E.L., "off

and on." During the time Pavon was the caseworker, from May to November, there were police reports of domestic violence incidents, but B.A. denied to Pavon that there had been violence.

Mark Gomez became the caseworker in November 2019, and continued in that role through trial. He testified B.A. tried to leave E.L. in early December 2019, but E.L. physically restrained her. She was finally able to get out of the apartment and called the police. Then at the end of December, E.L. was arrested and charged with aggravated sexual assault, assault with a deadly weapon, and strangulation. In early January 2020, B.A. told Gomez that E.L. had hogtied her, held a knife to her throat, raped and beaten her, and put her in fear for her life. However, when Gomez talked to B.A. a month later, she told him she had decided not to press charges. When Gomez pressed the issue, saying E.L. had almost killed her, B.A. responded, "that's kind of dramatic." Gomez testified the charges against E.L. remained pending in July 2020 and that B.A. continued to have contact with E.L. Gomez testified he re-referred B.A. to family violence prevention services, but she did not attend.

B.A. argues the Department failed to prove by clear and convincing evidence that she was aware of the potential for danger to the children in the time preceding their removal in September 2018 and that she consciously disregarded that risk. We disagree. The undisputed evidence established that prior to the incident that resulted in the children being removed, E.L. had injured B.F.L. at least two times. The first time B.F.L. was an infant and suffered multiple fractures and the second time E.L. caused B.F.L. to fall down the stairs. Each time, the child was in B.A.'s care. B.A.'s response to seeing blood on the floor after B.F.L. fell or was pushed down the stairs was to hurry the children to school. After receiving years of services to address domestic violence and to help her become a more protective parent, B.A. went back to cooking and did nothing to protect B.F.L. when she heard E.L. slap B.F.L. and saw her pinned against the wall and afraid. When her children went to school with multiple bruises in varying stages of healing, she explained some of

them by saying six-year-old B.F.L. had instigated the incident and the six-foot tall, two-hundred and fifty pound E.L. had simply disciplined her.

The evidence is also undisputed that before the children were removed in September 2018, B.A. had made police reports that E.L. "laid hands on her." She also told the Department's investigator that E.L. had choked her a few times. Although B.A. claimed not to know what domestic violence was, she had only recently completed six years of services with the Department, during which time she had participated in services to help her understand and address domestic violence.

B.A. contends the proof does not reach the level of being clear and convincing because caseworker Jones testified she did not have any evidence, other than hearsay, to support a belief that B.A., either in this case or the previous one, knew that E.L. was hurting the children. First, this testimony was somewhat inconsistent with Jones's other testimony, and the trial court was the sole judge of her credibility and of what testimony to believe. Jones testified earlier in the trial that the Department had believed since 2012 that there was domestic violence occurring in the household and the Department believed, based on its investigation of the previous case, that E.L. had harmed B.F.L. and B.A. had covered it up. Second, the Department was not required to prove that B.A. *knew* E.L. had harmed B.F.L. Rather, it was required to prove B.A. was aware of the potential for danger to the children's physical or emotional health, but disregarded it. *See I.N.D.*, 2020 WL 2441375, at *3 ("A parent does not need to know for certain that the child is in an endangering environment—awareness of a potential for danger is sufficient.").

We conclude the evidence and the reasonable inferences therefrom were sufficient to allow the trial court to form a firm belief or conviction that B.A. knowingly allowed the children to remain in surroundings that endangered their physical or emotional well-being. The evidence is sufficient to support findings that before the children were removed from the home in September

2018, E.L. engaged in domestic violence against B.A. and against at least one of the children, that E.L.'s violence posed a physical and emotional risk to all the children, that B.A. was aware E.L. was physically violent, but allowed him to remain in the home and disregarded the risk he posed to her children's physical or emotional well-being. Domestic violence and propensity for violence are evidence of endangerment. *Cf. R.S.-T.*, 522 S.W.3d at 110. An abusive home environment can endanger a child's physical or emotional well-being even if the abuse is not directed to that child. *See I.N.D.*, 2020 WL 2441375, at *3. And a parent who is aware of a potential danger, but disregards it, knowingly places or allows a child to remain in an endangering environment. *M.R.J.M.*, 280 S.W.3d at 502.

We hold the evidence is legally and factually sufficient to support the trial court's order terminating B.A.'s parental rights. We therefore affirm the order.

Luz Elena D. Chapa, Justice