# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00200-CV

---

**S. E., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY**
**NO. 22-0047-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

S.E. ("Mother") appeals from the trial court's order terminating her parental rights to her child ("Child") who was born in April 2022.[1] Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of statutory grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (O) (failing to comply with court-ordered family service plan). Mother also argues that the Department failed to prove that termination of her parental rights was in Child's best

---

[1] For the child's privacy, we refer to appellant by her initials or Mother and the child as Child, and we identify other persons by their relationship to Child. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The parental rights of Child's father ("Father") were terminated in the order of termination, but he has not appealed.

interest.[2] *See id.* § 161.001(b)(2). For the following reasons, we affirm the trial court's order of termination.

## BACKGROUND

In April 2022, the Texas Department of Family and Protective Services received a referral that Mother, while pregnant with Child, had tested positive for methamphetamines, and on July 22, 2022, the Department took custody of three-month-old Child when Mother was arrested for "possession."[3] Father and Child were with Mother in a vehicle when she was arrested, and the parents were unable to provide an appropriate caregiver for Child. Mother and Father had been married for approximately fifteen years, and Mother had three older children who were being taken care of by Mother's sister in Indiana. Around the time of Mother's arrest, Mother and Father admitted to using methamphetamines, and they and Child had been moving around and staying in different places.

On July 25, 2022, the Department filed an original petition for protection of Child, conservatorship, and for termination in suit affecting the parent-child relationship. The trial court signed an order for protection of Child in an emergency. The Department was appointed as Child's temporary managing conservator, and Child was placed in a foster home. In August 2022, the trial court signed an agreed temporary order following an adversary hearing.

---

[2] Mother's issues challenge the trial court's findings of statutory grounds for termination, but in the section of her brief providing a summary of her argument, Mother also argues that the Department failed to prove that termination of her parental rights was in Child's best interest. In the interest of justice, our analysis includes reviewing the sufficiency of the evidence supporting the trial court's best-interest finding.

[3] Mother testified at trial that she was arrested for possession of drug paraphernalia, and the Department's investigator testified that Mother was "arrested for possession" after the police found "[m]eth residue in her pocket" and a "crack pipe" in the vehicle.

2

The trial court ordered the parents to comply with the requirements set out in their family plans of service.

The dismissal date was extended, and the final hearing was held over four days: November 17 and December 15, 2023, and January 29 and February 6, 2024. The Department's witnesses were its investigator and current caseworker involved in the case; Father; Mother; Mother's sister; Child's foster mother; the Court Appointed Special Advocate (CASA) worker assigned to the case; and a former friend of Mother's. Mother's witness was a family friend, who was her sponsor for Alcoholics Anonymous (AA) and testified that Mother had made a "complete turn around," her home was suitable and ready for Child, and to his knowledge, Mother was no longer in a relationship with Father. The admitted exhibits included Mother's family plan of service; the Department's original petition; the affidavit by the Department's investigator in support of the Department's request for extraordinary relief; and letters of guardianship that were signed in Indiana in August 2022. The letters appointed Mother's sister (Sister) and her husband co-guardians of Mother's three older children. On the second day of trial, Father's affidavit of voluntary relinquishment of his parental rights also was admitted as an exhibit.

The Department's plan for Child if the parents' rights were terminated was adoption by the foster parents, who began taking care of Child when he was around four-months old. The evidence established that Child was loved and thriving in the foster home, that he was bonded with his foster parents, and that they were taking care of his needs. Mother testified that the foster parents "have been great to [Child]" and that she did not have any concerns with the placement, and Father testified that he was relinquishing his parental rights to Child because he believed it was in Child's best interest "[t]o stay where he is" and that he hoped that Mother's

3

rights were terminated so that Child could be adopted. The foster mother testified about their care of Child, including the therapy and treatment that Child had received and continued to receive while in their care. When Child first came into the foster parents' care, he was very small and was diagnosed with torticollis[4] and allergies to milk and eggs. The foster parents started feeding him hypoallergenic formula,[5] and he began gaining weight. He also began receiving physical, feeding, and speech therapy and treatment for torticollis, which included wearing a helmet. The foster mother testified that Child was "thriving" and "happy" in their home, that they hoped to adopt Child, and that if Child stayed in their home, she planned to maintain contact with Mother if it was appropriate and safe to do so and to maintain communication with Mother's sister and Child's siblings.

The evidence established that when the Department took custody of Child, Mother and Father had been using methamphetamines, including when Mother was pregnant with Child and after he was born; that there had been domestic violence between Mother and Father in front of Mother's older children; and that they did not have stable employment or housing. The Department's investigator testified that Mother admitted that she was using methamphetamines while pregnant with Child and after Child was born and that Father tested positive and admitted to using as well. In her testimony, Mother admitted to using methamphetamines "[a]lmost every day" when she was pregnant with Child from the end of the first trimester to the beginning of the third trimester. She also admitted to domestic violence

---

[4] The foster mother testified that torticollis is "basically unalignment of the neck and the spine" and that it was her understanding that the condition can occur because of parental neglect.

[5] The foster mother testified that the "dairy allergy was very apparent just because [Child] was throwing up everything [Child] was eating before we switched to a hypoallergenic formula."

4

between her and Father—"quite a bit of it the last few years"—in the presence of two of her older children, that she had started "fighting back and not leaving," and that she had put her older children "through hell."

Sister, who lived in Indiana, testified about how she had become the permanent guardian for Mother's three older children. She testified that she started taking care of Mother's children in 2018 after the Department reached out to her looking for a placement for them, but that in January 2020, they went back to Texas to live with Mother because after the Department's case was closed, Mother then demanded that Sister return the children to her.[6] In October 2021, Mother was pregnant with Child and again asked Sister for help. Sister offered to come get Mother, but Mother told her that she needed a few weeks. In November 2021, Mother called Sister and told her that they were "homeless" and staying in a "temporary hotel that someone paid for them overnight." Sister paid for the hotel so they could live there longer and sent groceries. In December 2021, Sister traveled to Austin and went to the hotel where the family was staying. When Sister arrived, she testified that "it was not a good situation" and that "the cleanliness of the hotel room wasn't anything that dogs or people should be living in." In addition to the family of five, they had four dogs, and the room was "filthy" with "trash everywhere" and "dog feces on the floor." The parents were "using meth again" and "in over

---

[6] Sister testified that she did not think that it was in the children's best interest for the children to return to Texas, but Mother and Father did. Sister reached out to the Department asking what she could do because Mother was "demanding the kids back" and raising concerns about "current drug use, not having a stable home, things like that," but the Department notified Sister that its case had been closed "because the children were safe with [them] in Indiana and there was no need for Texas to keep it open," and the Department was unable to help her.

their heads," and Mother "was not making good choices for the children."[7] At that point, Mother allowed Sister to take the three children with her to Indiana, and in August 2022, Sister became the children's legal guardian.

During her testimony, Mother agreed that her "history is bad" and that she has not made protective choices for her children in the past, but Mother asked the trial court to return Child to her because she had changed. Mother testified that she was separated from Father and no longer in contact with him, that the relationship ended a "couple" of months after Child was removed in July 2022, that she was living in a "completely different town" from him, that she was a different person, and that she was "sober now" and had been so for the past year. She had been living with her mother (Grandmother) and her stepfather in their home and was being paid to be Grandmother's caretaker. Her employment plan was to continue being a caretaker. She testified that their home had a room that was set up for Child, that the home had been "babyproofed," that she had completed her services and continued with some of them, and that she was "in a stable place."

Other witnesses, however, testified about their concerns with Mother's current situation, her honesty about her relationship with Father, and her ability to safely care for Child while also taking care of Grandmother, who had health issues. For example, Sister testified that she did not believe that Mother could take care of both Grandmother and Child; that Mother first used methamphetamines after Grandmother gave it to her; and that although Grandmother had

---

[7] Sister testified that one of the children "was crying nonstop about a toothache" and that when Sister looked in the child's mouth, "it was very clear thar [the child] had several rotten teeth and wasn't brushing regularly." When Sister took the child to the dentist, he confirmed that the child had "five rotten teeth." At that point, Sister was not the child's guardian so she asked Mother to authorize treatment, but Mother "basically blew it off every time [Sister] asked her to do that."

come a long way, she had abused prescription pills in the past. Sister also answered, "No," when asked if Grandmother could be protective. As to the relationship between Mother and Father, Sister testified that during its entirety, the relationship had been "on and off basically since they were married"; that there had been domestic violence between them; that they continued to see each other during the case; and that based on their history, she did not believe that the relationship between Mother and Father was off forever. Contrary to Mother's testimony, Sister testified that Father told her that the relationship ended in November 2023.

Except for Mother, the Department's witnesses testified consistently that termination of Mother's parental rights was in Child's best interest and that Child should not be returned to Mother. Sister testified that she did not think it would be in Child's best interest to return to Mother because her home was not a "stable environment" and Child was at a vulnerable age. Sister explained that she had "been down this road" with Mother with each of her children and that "[i]t just keeps repeating itself." She had heard the "story" Mother was telling "[s]everal times," and it turned out not to be true, with Mother going "back on drugs" and the children in "an unstable environment," and that that scenario was what was "likely" to happen again whether Mother was with Father or not. Mother's former friend also did not recommend returning Child to Mother, testifying that the last time that she saw Child before he was placed with the Department, he did not look well; he "was head to toe in a heat rash" and had "eye gunk" that he had "for a long time," and his car seat smelled of dog, vomit, and urine; and that she did not trust Mother to even care for a dog. The caseworker testified that it was not in Child's best interest to return Child to Mother because of her concerns with Mother "falling right back into the same pattern" and Child being "at a very vulnerable age." The evidence showed that when the Department had been involved with Mother in the past, she had relapsed after

7

participating in services and becoming sober. Mother admitted that the Department previously had removed her two oldest children and placed them with her sister-in-law until she completed services and became sober, that she became sober when she was pregnant with her third child, and that she relapsed "shortly after [the Department] closed the case and gave [her] kids back" and she gave birth to her third child.

In its order of termination, the trial court found by clear and convincing evidence statutory grounds (D), (E), and (O) applied and that termination was in Child's best interest. *See* Tex. Fam. Code §§ 161.001(b)(1)(D) (endangering environment), (E) (endangering conduct), (O) (failing to comply with court-ordered family service plan), (2) (addressing best interest). This appeal followed.

## ANALYSIS

**Standard of Review**

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the statutory predicate grounds and that termination is in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007.

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved

disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 631. In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to give to their testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case"); *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

**Endangerment Findings**

In her two issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings of statutory grounds. *See* Tex. Fam. Code

9

§ 161.001(b)(1)(D), (E), (O).  We limit our review to the trial court's endangerment findings—that (i) Mother knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, and (ii) Mother engaged in conduct or knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being.  *See id.* § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging termination under (D) and (E) grounds because of "due process concerns, coupled with the requirement for a meaningful appeal"); *see also In re R.R.A.*, 687 S.W.3d at 279 (reviewing termination under (D) and (E) grounds "because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)").

"'Endanger' means 'to expose to loss or injury; to jeopardize.'"  *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).  "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone."  *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).  "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department."  *Id.* at *13–14; *see In re C.E.*, 687 S.W.3d at 310 (stating that (D) and (E) grounds "do not require that endangering 'conduct be directed at the child' or that the child 'actually suffer[] injury'" (quoting *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022))).  "Conduct that subjects

10

a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 Tex. App. LEXIS 10272, at *14.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262.

In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.); *see In re C.E.*, 687 S.W.3d at 310 (stating that "termination under (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment"). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *V.P.*, 2020 Tex. App. LEXIS 938, at *9–10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining

11

to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503); *see also In re R.R.A.*, 687 S.W.3d at 280–81.

In this case, the investigator and others testified about the Department's concerns because of the parents' "pattern of drug abuse," domestic violence, "a lack of stable employment and stable housing," and inability to safely care for Child. The evidence established that there was domestic violence between Mother and Father in front of Mother's older children, that Mother and Father did not have stable housing or employment when Child was removed, that they were unable to provide an appropriate caregiver for Child when Mother was arrested, and that they had been using methamphetamines when Child was in their care. *See V.P.*, 2020 Tex. App. LEXIS 938, at *9–10; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *13–14; *see also In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child.").

Sister testified about the family's situation in December 2021 when Sister came to Austin and then took Mother's older children back to Indiana. Mother was pregnant with Child, and the family of five and four dogs were staying in a "temporary hotel" room that was "filthy" with "trash everywhere" and "dog feces on the floor," Mother and Father were "using meth again" and "in over their heads," and Mother "was not making good choices for the children." *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (explaining that "[e]vidence of a parent's drug use, or evidence that another parent allowed a child to be around a parent or other persons using drugs" can support terminating parental rights under (D) and (E) grounds). Mother's former friend testified that the last time she saw Child before Child was removed, he was not looking well, had a heat rash all over his body and "gunk" in his eye that he

12

had "for a long time," and Child's car seat smelled of dog, vomit, and urine. And foster mother testified about concerns with Child's physical condition when he came into their care and the therapy and other treatment that he needed to address his diagnosis of torticollis and food allergies.

During her testimony, Mother also admitted to using methamphetamines when pregnant with Child "almost every day" from the end of her first trimester to the beginning of her third trimester. "A mother's use of illegal drugs during pregnancy is an act that jeopardizes a child's well-being because it exposes the child to the possibility of being born with adverse medical conditions, even if there is no actual injury that results." *F.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 Tex. App. LEXIS 119, at *26 (Tex. App.—Austin Jan 9, 2020, no pet.) (mem. op); *see In re I.R.Z.*, No. 14-22-00431-CV, 2022 Tex. App. LEXIS 9004, at *13–14, 18–19 (Tex. App.—Houston [14th Dist.] Dec. 8, 2022, pet. denied) (mem. op.) (concluding that Mother's drug abuse during pregnancy supported terminating her parental rights under (D) and (E) grounds); *J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 Tex. App. LEXIS 9127, at *15–17 (Tex. App.—Austin Nov. 10, 2021, pet. denied) (mem. op.) (considering Mother's drug use during pregnancy as supporting endangerment findings). And Mother admitted to illegal drug use after Child was removed. *See In re R.R.A.*, 687 S.W.3d at 281 (considering evidence of parent's "continued pattern of drug use" as supporting endangerment finding); *C.V.L.*, 591 S.W.3d at 751 ("Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E)."); *J.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 Tex. App. LEXIS

13

9308, at \*18–19 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.) (considering ongoing drug use after child was removed as evidence of endangering course of conduct).

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule her first issue and do not address her second issue challenging the sufficiency of the evidence to support the (O) ground. *See In re N.G.*, 577 S.W.3d at 232–33.

**Best Interest**

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *Pruitt*, 2010 Tex. App. LEXIS 10272, at \*22–23.

14

The evidence established that Mother completed an inpatient rehabilitation program in 2023, that she had been sober for over one year, that she had completed the tasks on her family service plan, and that she had appropriate supervised visits with Child during the case. Mother also testified that she was a different person and no longer in a relationship with Father, that she had a stable home and employment, and that the home had been babyproofed and had a room that was set up for Child. Mother's family friend and current AA sponsor also testified that she had made a "complete turn around"; that to his knowledge, she had not continued her relationship with Father; that the family friend was assisting and supporting her now and would continue to do so; and that he believed her home was clean, stable, and suitable for Child.

The trial court, however, reasonably could have disbelieved that testimony and instead credited the evidence of Mother's endangering conduct, concerns with her current home, and Child's needs to find that it was not in Child's best interest to be returned to Mother's care. *See Holley*, 544 S.W.2d at 371–72 (including parental abilities, stability of home, needs of child now and in future, and danger to child now and in future among relevant factors in accessing child's best interest); *see also In re A.B.*, 437 S.W.3d at 503 (deferring to decisions of factfinder who "is sole arbiter when assessing the credibility and demeanor of witnesses"). Except for Mother, the Department's witnesses testified consistently to their belief that Mother's parental rights should be terminated and that Child should not be returned to Mother's care.

For example, Sister testified that she had been "down this road" with Mother before with each of her children, that she had heard the "story" Mother was telling "several times" that turned out not to be true, and that:

> It's just the same thing on repeat. Myself or other people step in and try to find a place for her to live or try and, you know, help out financially or help with, you

15

know, setting up doctor appointments or whatever it is, or helping them fill out job applications or anything, bringing them into my own home, helping her find a job here, setting up, you know -- getting the kids in school, whatever it is, and it always turns out the same. It will go well for a little while, and then immediately it is right back in the same old patterns and taking the kids out of a stable situation and not caring what their feelings are, what they want.

Sister also testified that she did not believe that the relationship between Mother and Father was ended forever, that Mother could take care of Grandmother and Child, or that Grandmother could be protective. Mother admitted and other evidence showed that the Department had been involved with Mother and her children in the past and that she had relapsed after participating in services, becoming sober, and having her children returned to her. And the current caseworker testified that she believed the parents were still in communication with each other, and Mother's former friend testified that Father told her that their relationship was ongoing.

The trial court also reasonably could have considered Child's vulnerable age, his bond with his foster parents who hoped to adopt him if parental rights were terminated, and the foster parent's care of Child after he was placed in their care. *See Holley*, 544 S.W.2d at 371–72. The evidence showed that Child was "thriving" and "happy" in their care and that they had been taking care of his needs, including arranging for therapy and necessary treatment for his medical needs. Foster mother also testified that she planned to maintain communications with Mother if it was appropriate and safe to do so and to maintain communications with Sister and Child's siblings. *See id.* (including plans for child by individual seeking custody among relevant factors in accessing child's best interest).

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the trial court's best-interest finding against Mother. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31.

16

**CONCLUSION**

For these reasons, we affirm the trial court's order of termination.

_____
Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed:   June 27, 2024